[Nos. 24940, 24941, 24942. Department One. December 3, 1934]

THE STATE OF WASHINGTON, *on the Relation of Puget Sound Power & Light Company, Respondent,* v. THE DEPARTMENT OF PUBLIC WORKS *et al., Appellants.*

THE STATE OF WASHINGTON, *on the Relation of The Washington Water Power Company, Respondent,* v. THE DEPARTMENT OF PUBLIC WORKS *et al., Appellants.*

THE STATE OF WASHINGTON, *on the Relation of Pacific Power & Light Company, Respondent,* v. THE DEPARTMENT OF PUBLIC WORKS *et al., Appellants.*[1]

[1]Reported in 38 P. (2d) 350.

*The Attorney General, Geo. G. Hannan,* and *Ferd J. Schaaf, Assistants,* for appellants.

*Todd, Holman & Sprague* and *Cleland & Clifford,* for relator Puget Sound Power & Light Co.

*Post, Russell, Davis & Paine,* for relator Washington Water Power Co.

*John A. Laing, Henry S. Gray,* and *Rigg, Brown & Halverson,* for relator Pacific Power & Light Co.

TOLMAN, J.—For consideration in this court, three appeals, each in a separate case and from a separate judgment, have been consolidated and are briefed, argued and submitted as a single cause, the purpose being to review in one proceeding three judgments of the superior court, each reversing an order made by the department of public works.

The proceedings were instituted by the department on its own motion in the early part of the year 1933, the complaint charging excessive and improper rates and practices in the matter of furnishing electric power service to farmers and orchardists for irrigation and orchard spraying in the several territories or districts served by each of the respondents; the gist of the charges being that the rates of each of the respondents for such service were unjust, unfair and un-

reasonable, and for the season of 1933 such rates would be oppressive, in excess of the value of the service, and beyond the ability of the customers to pay, resulting (unless reduced) in irreparable injury both to the respective respondents and to the customers of each. There were other charges questioning the rules and regulations of the several respondents which authorized discontinuance of service for nonpayment of charges, required the making of deposits and the furnishing of security for such charges.

Public hearings were had in a number of places throughout the state, and those interested as consumers of electrical power were invited to attend and testify. A vast amount of evidence was thus taken which abundantly demonstrates that farmers and orchardists generally, including those using electrical power for irrigation and spraying purposes, are and for some years have been producing at a serious loss, apples especially realizing for the producer far less than the actual cost of production. A picture of distress is presented which is appalling in the extreme, and which cries aloud for a remedy. The department made exhaustive findings, from which we quote briefly.

"It was the intent and purpose of the department in initiating the proceeding to inquire along broad lines as to the economically sound thing to do in the interests of both the customers and the companies. Their interests are and must necessarily be so identified that neither can in the long run profit unless both do. The inquiry involved determination of the condition, earnings and needs of the farmers, and the conditions, earnings and requirements of the companies. . . .

"The question is not whether these customers can pay the present rates by sacrificing everything else, but rather whether the services which those rates cover can, under any reasonable assumption of facts, be con-

verted into a product of value to the customers. In this case irrigation power and spray service is purchased only to grow products, principally apples. Intelligence will not long continue to make purchases to raise products that cannot be sold for the cost of the raising. A reasonable choice must necessarily lead to going without the service, and abandoning the farms; a choice which the record shows is being made with surprising frequency. . . .

"The record is full of individual expressions tinged with the bitterness of despair. Discontinued service and abandoned places were told of everywhere. Predictions of disaster were common. Not once did anyone testify, or know, or have even heard of, any irrigation farmer in Washington who made money, or even broke even, in 1932. The story was one entirely of gloom, without seemingly a single exception to serve as a ray of hope. . . .

"After four years of depression the farmers' income has all but disappeared and his reserves are completely exhausted. His only remaining source of credit is a limited one from governmental agencies, and upon a crop which he cannot sell for the cost of the raising. It seems imperative that his costs be reduced. . . .

"The board finds that rate reductions are both necessary and advisable. These must be substantial enough to be of aid, and to bring the rates within the present 'value of service,' and still leave those rates sufficient to make the business profitable to the companies. This calls for some difference of treatment of the different schedules and of the different companies, because of lack of uniformity and other existing variations. In accordance therewith the board finds that for the 1933 season, effective as of the date of the filing of the complaint herein, and continuing until December 31, 1933, the following changes and modifications should be made in the rate schedules and rules and regulations of the respondent companies, to-wit:"

Then follow certain specific reductions in rates running from ten per cent, or perhaps a little less, to thirty-five per cent; and the companies are ordered

to file revised rate schedules accordingly, which shall be effective for the 1933 season and until December 31, 1933.

The department offered and received no testimony whatever as to the nature and amount of investment in plants and facilities for furnishing power service for irrigation and spraying, nor as to the cost of rendering this service, or as to the rate of return to the several respondents therefrom, the record being wholly silent upon the subject of whether the service was being rendered at a profit or at a loss to the respondents. The department did, however, present certain figures purporting to show that each of the respondents had carried on its business as a whole in the state of Washington during the years 1928 to 1932, inclusive, at a profit ranging from a low of 5.94 per cent in 1932 to a high (in one instance only) of 10.02 per cent in 1929. From these figures, apparently, the department found, as already quoted, that the rates might be reduced to the present "value of service and still leave those rates sufficient to make the business profitable to the companies."

Upon the entry of the order by the department, each company, acting independently, sought a review by the superior court, each serving upon the other two a copy of its petition, but not making them parties thereto.

The department demurred, and moved to quash because of defect of parties. These attacks being unsuccessful, the three proceedings were heard as one, resulting in the orders of reversal, from which the department has appealed.

■ The first question raised is as to the procedure. No doubt, the three respondents might have joined in one application for a writ of review, or each might have joined the other two as respondents, but

each of the companies operates in its own independent field, each has its own rate schedules designed to meet the conditions of its own business, and neither has anything in common with the other, save only that it is engaged in the same line of business. The rates of each must be governed by the conditions under which each operates. Each one, then, had an independent interest and an independent right to attack the order of the department under Rem. Rev. Stat., § 10428 [P. C. § 5613], and since all appeared and were heard, no one is prejudiced in any way. There was no prejudicial error in the ruling of which complaint is made. We proceed now to the merits.

One of the main purposes of our statutory public service law is that rates shall at all times be non-discriminatory, non-preferential, and just, reasonable and sufficient "to yield a reasonable compensation for the service rendered," Rem. Rev. Stat., § 10390 [P. C. § 5581]. It is just as important in the eye of the law that the rates shall yield reasonable compensation as it is that they shall be just and reasonable and non-discriminatory from the standpoint of the customer, because unless every rate does yield reasonable compensation, public service companies must resort to discrimination in order to live or must eventually be forced out of business. Every statutory element must be recognized in the fixing of rates, or the result will be to defeat the legislative purpose.

The respondents charge and the trial court found that here the department departed from the statutory principles, and adopted a theory which, standing alone, has never been recognized as a basis for rate making and which is fundamentally unsound.

While we start with the presumption that the findings of the department are *prima facie* correct, yet, separating the facts found from conclusions of law and

from conclusions of fact having no foundation in the evidence or in the basic findings, it would seem that, without discussing the mass of evidence revealed in the record, it is sufficient to say that the vital question here presented is, May the department fix rates based upon the value of service to the consumer, the ability of the consumer to pay, or prevailing economic conditions, or are all three combined sufficient reasons for compelling public service companies to furnish any particular service for anything less than reasonable compensation?

These elements are to be considered in connection with all of the other facts and circumstances which bear upon the question of what is reasonable and sufficient compensation, and the courts have often so held. *Smyth v. Ames,* 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819; *Puget Sound Electric Railway v. Railroad Commission of Washington,* 65 Wash. 75, 117 Pac. 739, Ann. Cas. 1913B, 763; *North Coast Power Co. v. Kuykendall,* 117 Wash. 563, 201 Pac. 780.

No authority has been cited, and we know of none, which goes further and holds to the effect that the value to the consumer, or his ability to pay, is the prime factor which alone will warrant the reduction of a rate affording no more than reasonable compensation.

On the contrary, in a case recently decided, entitled *Telluride Power Company v. Public Utilities Commission of Utah,* 8 Fed. Supp. 341, by a statutory three-judge Federal district court (U. S. district court, district of Utah, central division, August 29, 1934), in discussing the particular point here raised, it was said:

"We cannot agree that any opinion of the United States Supreme Court sustains the proposition that in fixing fair and reasonable rates the customer's ability to pay and the value of the service to him are paramount and controlling. If rates are so low as to be

confiscatory of the utility's property, they are condemned by the Fourteenth Amendment. If they are so high as to yield a greater return on the value of the property used and useful in the service than other investments made with equal risk, they are unfair to the customer and should be reduced. He is entitled to have them reduced.''

It is quite apparent from the findings of the department that, from the high tide of 1928 and 1929, the earnings of these respondents rapidly decreased, and that, in the year 1932, neither was earning a rate which could be called adequate, though perhaps what might be deemed sufficient compensation under the conditions prevailing. There was ample evidence to show that, in the year 1933 up to the time of the hearing, their earnings were still less than during the corresponding period of the year 1932, so that nowhere is there any support for the idea that the charges for this service were in anywise unreasonable.

It is true, perhaps, that the abandoning of the farms will affect the future demands for power, but if enlightened self-interest does not lead the respondents to go as far as they can or may in maintaining a market, the law may not compel it.

The distress shown in the record is real and acute, but the cost of electric power is but a very small item in the total cost of production, and with it eliminated entirely, still the farmer and the orchardist, according to this record, could not possibly make both ends meet. In any event, however, public service companies are not eleemosynary institutions, and they cannot be compelled to devote their property to a public use except upon the well-recognized basis of a fair and reasonable return therefor. Through general taxation only, in common with all taxpayers, can they be compelled to contribute to the relief of the distressed.

The department urges that there is a part of its order which is outside of and beyond the 'emergent and temporary reduction of rates, and which applies only to rules, regulation and service. It is urged that the permanent portion of the order should not have been reversed. On the contrary, the respondents contend that these so-called permanent rules and regulations do, in fact, reduce rates. The size of the record and our lack of practical knowledge forbids an attempt to now determine whether or no these rules affect the rates, and therefore the affirmance of the judgments will be without prejudice to the right of the department to reenact rules and regulations affecting the service, but not reducing the rates.

The judgments appealed from are affirmed.

MAIN and MILLARD, JJ., concur.

BEALS, C. J., and GERAGHTY, J., concur in the result.