368 A.2d 1194.

NARRAGANSETT ELECTRIC CO. *vs.* WILLIAM W. HARSCH *et al.*

JANUARY 13, 1977.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

PAOLINO, J. This is a statutory petition for certiorari brought by the Narragansett Electric Company (the company) pursuant to G. L. 1956 (1969 Reenactment) §39-5-1, seeking a review of the Public Utilities Commission's (the commission) report and order in a rate proceeding instituted by the company. Briefs have been submitted by the company, the Attorney General (on behalf of the commission) and the Rhode Island Consumers' Council (the council).

According to the record before us, the company is engaged in the generation, purchase, transmission, distribution and sale of electricity. All of the company's common stock is owned by the New England Electric System (NEES), a holding company chartered under the terms of the Public Utility Holding Company Act of 1935. The company is also affiliated with the New England Power Company (NEPCO) which is a Massachusetts corporation

engaged in wholesale electric generation and transmission. NEPCO has approximately 30 customers which purchase all or a major portion of their requirements from NEPCO and which, in turn, sell and distribute electricity at retail to ultimate consumers. NEPCO is engaged in interstate business and is thus regulated by the FPC. Since 1967, with the approval of the FPC, the company and NEPCO have operated together under a so-called "integrated facilities contract" by which the company purchases virtually all of its energy requirements from NEPCO. Under the 1967 contract, the company's and NEPCO's generating and transmission facilities are integrated in order to maximize efficiency. Costs incurred by the company in connection with its integrated facilities are offset as credits against its power bills from NEPCO.

On September 27, 1974, the company filed with the commission a proposed upward revision of its rates, tolls and charges so as to realize an additional $10.2 million annually. The company proposed to collect said additional sums commencing on November 1, 1974, with the exception of $5.4 million which the company sought to start collecting as of October 15, 1974, on an emergency basis subject to possible refund. General Laws 1956 (1969 Reenactment) §39-3-13.

The commission docketed the company's application and on October 11 and 17, 1974, conducted hearings regarding the requested emergency relief. On October 15, 1974, the commission entered an order suspending implementation of the entire application for 6 months, §39-3-11, and on November 1, 1974, the request for emergency rate relief was denied.

Thereupon the company submitted prepared testimony and exhibits purporting to support the propriety of the $10.2 million increase in revenues. Public hearings on the proposed increases spanned the period between June 10,

1975 and July 14, 1975. At those hearings, the proposal was evaluated on the basis of data compiled during a test year composed of the 12 months ending March 31, 1975.

Shortly after the conclusion of the hearing, by an order dated July 31, 1975, the commission rejected the company's proposed rate increase and found instead that the company was only entitled to additional annual revenues of $909,000. The company was directed to revise its proposal to reflect this finding and to resubmit it for implementation.

On August 6, 1975, the company filed its statutory petition for certiorari seeking review of the commission's decision. We thereupon ordered the writ to issue. *Narragansett Elec. Co. v. Harsch,* No. 75-218 M. P. (R.I., Order filed August 8, 1975).

*I. The Roles of the Attorney General and the Commission*

At the outset we are confronted with two interrelated issues raised in our order of February 26, 1976, *Narragansett Elec. Co. v. Harsch,* 116 R.I. 907, 352 A.2d 400 (1976), wherein we denied without prejudice the company's motion that the Attorney General be barred from filing a brief in the present case. In that order, we directed the parties to brief and argue the questions whether the Attorney General represented the public or the Public Utilities Commission and whether or not the commission is a proper party to this petition.

Inasmuch as the entire field of utilities regulation is governed by statute, the resolution of these questions lies in our reading of the pertinent provisions of the general laws. *See generally* G.L. 1956 (1969 Reenactment) title 39, as amended by P.L. 1969, ch. 240, §1. Prior to 1969, all authority to regulate utilities and to set and approve rates was vested in the Division of Public Utilities within the Department of Business Regulation. All matters involving proposed changes in rates were submitted to the admini-

strator of said division for hearing, investigation and the issuance of appropriate orders. Persons aggrieved by such orders were entitled to judicial review thereof in the Superior Court within the strictures of the Administrative Procedures Act.[1] In essence, therefore, the administrator and the Division of Public Utilities exercised a broad range of administrative powers and whatever judicial powers were incidental to the general duties to conduct hearings and to make investigations as to the propriety of proposed changes in utility rates.[2]

With the enactment of P.L. 1969, ch. 240, §1, the General Assembly effected a major revision of the processes by which proposed rate changes were to be scrutinized and by which utilities were generally to be regulated. Most significantly, the newly enacted §39-1-3 created within the Department of Business Regulation a Public Utilities Commission (the commission) and a Division of Public Utilities and Carriers (the division) which were both ordained as independent bodies free from the jurisdiction of the department director. In the following language, the jurisdictions and powers of the two new units were set forth by the Legislature:

> "* * * The [Public Utilities] commission shall serve as a quasi-judicial tribunal with jurisdiction, powers, and duties to hold investigations and hearings involving the rates, tariffs, tolls and charges and the sufficiency and reasonableness of facilities and accommodations of [various] public utilities * * *. The admini-

---

[1] The Administrative Procedures Act is found in G.L. 1956 (1969 Reenactment) ch. 35 of title 42.

[2] This arrangement would seem to conform to the historical view that the regulation of utilities and the setting of rates for the future is a legislative function. A corollary of this view is that proceedings to determine proper rates, while possessing some attributes of a court trial are more accurately perceived as a delegated legislative function. Pillsbury, *Administrative Tribunals,* 36 Harv. L.Rev. 405, 420 (1923).

strator [of the Division of Public Utilities and Carriers] shall exercise the jurisdiction, supervision, powers and duties not specifically assigned to the commission. By virtue of his office, the chairman of the public utilities commission shall be the public utilities administrator who shall supervise and direct the execution of all laws relating to public utilities and carriers and all regulations and orders of the commission governing the conduct and charges of public utilities, and who shall perform such other duties and have such powers as are hereinafter set forth." General Laws 1956 (1969 Reenactment) §39-1-3.

Inasmuch as the statute is not entirely clear in its delineation of the powers of the commission and division respectively, we must attempt herein to ascertain the legislative intention from a consideration of the legislation in its entirety, viewing the language used therein in the light, nature, and purpose of the enactment thereof. *Mason v. Bowerman Bros.*, 95 R.I. 425, 431, 187 A.2d 772, 776 (1963). In so doing, it is our belief that the only meaningful way in which to read the present statute and specifically, the above-quoted provision, is that the General Assembly intended by its enactment to segregate the judicial and administrative attributes of ratemaking and utilities regulation and to vest them separately and respectively in the commission and the administrator (or division).[3] Other provisions in title 39 support this interpretation. For instance, the commission is clothed with the "powers of a court of record" in determining and adjudicating matters within its jurisdiction (§39-1-7). It is further empowered to make orders and render judgments and to enforce the

---

[3]In *Providence Gas Co.* v. *Public Util. Comm'n*, 116 R.I. 80, 352 A.2d 630 (1976), this court superficially acknowledged the bifurcation of functions between the Division of Public Utilities and Carriers and the Public Utilities Commission. We held that while one person was both the division's administrator and the commission's chairman, he could not pretend to act in one capacity in dealing with matters more properly addressed to him in the other capacity. *Id.* at 84, 352 A.2d at 632.

same by suitable process (§39-1-7). The commission is defined at one point in the statute as an "impartial, independent body" which renders decisions affecting both the public interest *and private rights*[4] based upon the law and the evidence (§39-1-11). The commission is permitted, in much the same manner as a trial justice in the courts, to conduct prehearing conferences and issue prehearing orders which control the conduct of the rate case (§39-1-12). *Cf.* Super. R. Civ. P. 16. The several commissioners are empowered to administer oaths, to summon and examine witnesses, to compel production and examination of papers, books and other evidence, and to apply to a Superior Court justice to have persons held in contempt of the commission's process (§39-1-13). Furthermore, the commission has been granted broad powers to issue appropriate orders preventing irreparable injury to the public interest (§39-1-32), and to order additions, alterations or extensions to a utility's plant or equipment when such are deemed necessary (§39-4-2).

In contrast to the aforementioned judicial powers enjoyed by the commission are the general and administrative powers conveyed to the administrator and the division as set forth in ch. 3 of title 39. Of particular relevance to this case, though, is the interrelationship which the statute has established between the commission and the administrator (or division) in matters dealing with rates, tariffs, tolls and charges. Section 39-1-11 requires that the commission's adjudications be based upon the law and upon the evidence as "presented before it by the division and by the parties in interest." It would appear, therefore, that

---

[4]It has been held by certain authorities that the true test for differentiating between administrative and judicial functions is that only by the latter may a question of *private rights* be decided, based upon a claim arising out of past wrongs and involving a determination of facts or the construction and application of existing law. *See Trybulski v. Bellows Falls Hydro-Elec. Corp.*, 112 Vt. 1, 8, 20 A.2d 117, 121 (1941).

the Legislature perceived that, in matters brought for hearing before the commission, the division would assume a role not unlike that of a party in interest. This version of the legislative intent is further borne out by a later passage in the same title which requires that, upon the issuance of a writ of certiorari by this court, citations shall issue from the clerk "to all parties in interest, including the public utility administrator." Section 39-5-2. Thus, it would appear that the party-like posture of the administrative arm of the bifurcated regulatory machinery has been purposely carried through to the appellate level.

One final passage of the General Laws lending support to the position that the division appears as an adversary participant before the commission in rate hearings also resolves the question raised by our order of February 26, 1976, regarding the Attorney General's participation in these and similar proceedings. That is, by the authority of §39-1-19, the Attorney General or a designee shall honor the request of the administrator to "appear and represent the division in any hearing, action, investigation, or proceeding under this title * * *." Such hearings, actions and proceedings include, of course, hearings before the commission (§39-1-11), and certiorari proceedings before this court (§39-5-1). Thus, it seems manifest that, in pursuit of the public interest set forth in §39-1-1, the Legislature has conceived a system whereby the Division of Public Utilities and Carriers, in addition to its broad regulatory powers, appears on behalf of the public to present evidence and to make arguments before the commission.[5] The At-

---

[5]We cannot be swayed in our determination of this issue by the argument that the Rhode Island Consumers' Council is the only qualified party-in-interest representing the public sector. Section 39-1-17, indeed, provides that, in rate cases, the council shall be a party-in-interest and, as such, that it is entitled to receive all notices, etc. That section states further, however, that the council "may file complaints, institute proceedings, participate as a party in administrative hearings, and institute

torney General or his designee is required, in most instances,[6] to represent the division in this role, §39-1-19, and the commission is required to determine and to adjudicate matters before it as an impartial and independent quasi-judicial tribunal.[7] Sections 39-1-3 and 39-1-11.

Thus, in answer to the first question presented by our order regarding whether the Attorney General represents the public or the commission, we hold that, strictly speaking, he represents neither. The language of §39-1-19 is abundantly clear in specifying that the Attorney General shall serve as counsel, upon request of the administrator, to the division in all hearings, investigations, actions and proceedings arising under title 39. The arguments pre-

---

or participate in any appeal to the supreme court as an aggrieved party." Section 39-1-17 (emphasis added.) By the terms of this passage, the participation of the council is obviously discretionary. The Legislature could not have intended that the protection of the public interest, which is the very premise of the statute, §39-1-1, would be contingent upon such circumstances as budgetary limitations on the activity of the council.

Furthermore, there is no language in any section dealing with the council's participation which indicates that its role in these matters, should it choose to exercise it, is preemptive with regard to the participation of the Division of Public Utilities and Carriers. Indeed, G.L. 1956 (1969 Reenactment) §42-42-5, as amended by P.L. 1969, ch. 33, §1, provides that nothing in that chapter of the General Laws" * * * shall be so construed as to exclude any other attorney or counsel for any person, association or corporation," when the council chooses to participate in a given case.

[6]It is to be noted that, to avoid any potential conflict of interest where the division and the state, or citizens thereof, call upon the Attorney General to represent each of them in their respective positions in the same case, §39-1-19 enables the division to retain legal counsel of its own within the strictures of §39-1-20. This has the effect, of course, of freeing the Attorney General to intervene, when necessary, on behalf of the state or its citizens as customers of a utility company.

[7]In order to appreciate that this marks a departure from the historical view of rate fixing and utility regulation as administrative or legislative, rather than a judicial function, compare Rhode Island's statutory provisions in this regard with Pillsbury, *Administrative Tribunals*, 36 Harv. L.Rev. 405, 420 (1923).

sented to us on this issue would indicate that all parties have been laboring under the misapprehension that the Attorney General's services were available to the commission rather than to the division.[8] In the present case, the fact that the Attorney General's brief was submitted on behalf of the Public Utilities Commission rather than on behalf of the Division of Public Utilities and Carriers is only a formal error which is not a ground for reversal.

With regard to the second question posed by our order, that is, whether the commission is a proper party to this petition, we hold that it is not. It is apparent from the foregoing discussion of the relevant statutory provisions that the Legislature intended that the commission shall sit as a quasi-judicial tribunal and that its administrative affiliate, the division, would appear before it, through counsel, as an adversary participant in the commission's hearings. It is clear also that the Legislature envisioned that the division would similarly be a participant in and be represented by the Attorney General in certiorari proceedings before this court. Turning to the present case, the fact that the named respondents are the Public Utilities Commissioners individually and in their official capacities is not a fatal flaw. Specifying the commissioners rather than the administrator or the division as respondent constitutes only a formal error which has absolutely no effect upon the rights of the parties.

*II. Cash Working Capital—Purchased Power Expense*

Cash working capital is the amount of cash required by the company to continue operations during the interim

---

[8]While, in view of past practice, this distinction between the commission and the division might appear to be a semantical one, all concerned parties would do well in the future to harken to the wording of the statute as interpreted herein, lest serious conflicts of roles develop.

We do not reach or decide, in this case, whether it is proper for the Attorney General to supply staff counsel to the commission and division under §39-1-20 as well as to the division alone under §39-1-19.

between the rendition of services to its retail customers and receipt of payment therefor. *New England Tel. & Tel. Co.* v. *Public Util. Comm'n*, 116 R.I. 356, 383-84, 358 A.2d 1, 18 (1976). In the instant case, the company requested that its rate base include a working capital allowance of $7.8 million, of which $7.011 million was attributed to purchased power expense. The company produced evidence to the effect that under a 1967 contract it purchased virtually all of its primary electricity for resale from NEPCO, was billed for that power 12 days after each service month, and, despite the fact that no interest penalty accrued until 30 days after receipt of the bill, paid such bill within 2 days of its delivery. The company also produced a lag study which demonstrated that the company was not reimbursed for these cash outlays by its retail customers for 28.22 days. In order to compensate for the depletion in its cash reserves that this lag causes, the company claims a need for a cash working capital allowance in excess of $7 million.

At the hearing before the commission, this item of cash working capital was attacked on the ground that paying purchased power bills when rendered constituted an unnecessary prepayment which worked to the detriment of the company's customers. Even though such bills may be technically due when rendered, it was argued that the company is, in effect, given 30 days in which to pay such bills because no interest accrues until 30 days has passed after the rendering. The commission adopted this reasoning and rejected the company's contention that it had an affirmative contractual duty to pay the NEPCO bill when it was rendered. The entire request for cash working capital to cover purchased power expense was, therefore, rejected.

In reaching its ultimate conclusion on this issue, the commission found as a fact that the company and NEPCO are parts of one integrated system and that inquiry into

the propriety of this single item of rate base cannot be artificially limited to any single entity within the system. The commission found further that, as a result of this interrelationship, the company's intrastate customers support, in their rates, the 45-day working capital allowance given to NEPCO by the FPC. That is, because the entire power system receives payment from the ultimate consumer within 42.2 days after the service month in which NEPCO delivers primary electricity to the company, NEPCO's 45-day lag has been accounted for.

The commission also grounded its denial of this item of cash working capital in its reading of the terms of the 1967 contract between the company and NEPCO. It was reasoned that because the company is effectively granted 42 days after the service month in which to pay its bill to NEPCO (12 days from the end of the service month to delivery of the bill plus 30 days' grace before interest is charged), it has demonstrated no need for cash working capital for purchased power expense to cover a lag of 28.22 days.

This is not the first time this court has been asked to review exclusion of this item from this company's rate base. In *Rhode Island Consumers' Council* v. *Smith*, 113 R.I. 384, 399-402, 322 A.2d 17, 25-26 (1974), this company sought a cash working capital allowance sufficient to cover the same 28.2-day lag. In that case we held that a utility cannot claim an allowance for cash working capital as a matter of right but that such an allowance is addressed to the sound discretion of the commission. The determination of the size of such an allowance, when awarded, is a question of fact, which may vary from case to case. *Id.* at 401, 322 A.2d at 26. In applying these principles to a set of circumstances virtually identical to those presented in the

case at bar,⁷ this court concluded that the factual issue had merely been resolved by the commission against the company; that, because the company was given a grace period in which to pay purchased power bills before interest would be charged, the suggested addition to the rate base was not required to enable the company to meet its current obligations. *Id.* at 401, 322 A.2d at 26, quoting *Alabama-Tennessee Nat. Gas Co.* v. *FPC,* 203 F.2d 494 (3d Cir. 1953). We concluded that it did not seem fair to burden the ultimate power consumer with the higher rates that would result from the company's choice to pay power bills before they start to incur interest. *Rhode Island Consumers' Council* v. *Smith,* 113 R.I. 384, 401, 322 A.2d 17, 26 (1974).

Nothing has been presented by the company in the instant case to demonstrate that the nature of its affiliation with NEES and NEPCO has changed since 1974 when the earlier case was decided. We believe, therefore, that our earlier decision controls in this instance despite the company's attempt to distinguish that case from this one. Even assuming, as the company alleges, that this court erred in that case by stating that other affiliates of NEPCO do not pay their bills when due, this narrow finding of fact was not the sole basis for our affirmance of the commission's decision. The thrust of that decision remains that the commission found as a fact that the existence of a grace period, of which the company chose not to take advantage, rendered the requested sum unnecessary to meet current obligations.

Similarly, in the instant case, the commission has found

---

⁷In reference to this issue, the only significant difference between the earlier case and the case at bar is that in the former the company was charged interest on unpaid purchased power bills commencing 60 days rather than 30 days after rendition. *Rhode Island Consumers' Council* v. *Smith,* 113 R.I. 384, 400, 322 A.2d 17, 25 (1974).

as a fact that the integrated area-wide electric system is fairly and adequately compensated by the working capital allowance awarded to NEPCO based on the 45-day lag between delivery of power to the company and payment for that power by the retail customer.

The commission found additionally as a fact that, on the basis of its reading of the payment provisions of the 1967 contract between NEPCO and the company, "there is no working capital requirement for purchased power."

The facts, as found by the commission, preponderate against granting the requested allowance. We have stated that these matters are addressed to the commission's sound discretion. In the absence of an abuse of that discretion, a disallowance of a particular sum as cash working capital will not be set aside. *Rhode Island Consumers' Council* v. *Smith*, 113 A.2d 384, 395, 322 A.2d 17, 23 (1974). The company's arguments on this appeal have failed to convince us that the commission's findings constitute an abuse of discretion. Specifically, we find the company's attempt to characterize their choice of a bill-paying policy as a business management judgment (and thus presumably to benefit by the broad deference given to such judgment) singularly unconvincing. As we stated on an earlier occasion: "[t]he Commission is merely requiring the utility to exercise the kind of prudent money management the ratepayer has a right to expect from a regulated monopoly." *Id.* at 402, 322 A.2d at 26.

### III.   *Allocation of Additional Tax Depreciation*

The second issue raised by the company's petition for certiorari is whether the commission properly allocated certain sums representing additional tax depreciation between interstate and intrastate accounts. It is the company's basic position that the commission acted arbitrarily and abused its discretion by assigning nearly all of one portion of such depreciation to an interstate account.

Depreciation, of course, is the process of continued loss to property resulting from factors such as wear and tear and technological obsolescence which eventually leads to the retirement of that property. The amount of depreciation experienced annually may be reflected as a deduction from income for tax purposes.

The Internal Revenue Service (IRS) permits the company to calculate depreciation of some property on an accelerated scale which has the effect of allowing a larger depreciation early in the life of the property and smaller amounts later on. The IRS also provides a guideline depreciation scale which sets annual depreciation for certain other property in more constant amounts over the life of the property. Even more conservative than either of these scales is the depreciation of property as carried on the company's own books of account.

The amounts by which accelerated exceeds guideline depreciation and guideline exceeds book depreciation are appropriately referred to as additional tax depreciation. Internal Revenue Service regulations require that additional tax depreciation on property acquired after 1969 be normalized. See IRC sec. 167(1). That is, for rate-making purposes, a utility treats the additional tax depreciation as if the tax deduction for that amount of depreciation did not exist and computes the amount of tax that would be owed if the deduction were, in fact, income and adds the amount of the hypothetical tax to the cost of service. The cost of service and, therefore, the rates charged to customers are artificially inflated. The effect of this accounting procedure is to collect from current rate payers those taxes which will not, in fact, become due until some future date and thus to spread the tax burden more evenly among present and future customers of the utility.

On the other hand, additional depreciation on property acquired prior to 1970 is treated as a flow-through item.

That is, the tax deduction to which the company is entitled for depreciation is reflected currently in the company's tax calculations and this tax benefit is thus passed on immediately to the consumer in the form of lower rates.

In the present case, the company experienced a total difference between accelerated and guideline depreciation on all property (both interstate and intrastate) of $2,569,-000 of which $380,000 was attributable to pre-1970 properties and $2,189,000 was attributable to post-1969 additions to property. Although the additional tax depreciation attributable to pre-1970 properties was lowered by the commission from $380,000 to $259,000 in order to reflect the ratio of intrastate to total rate base, none of the parties seems to dispute the accuracy of these figures nor does any party question the various allocations that the commission made of these sums between interstate and intrastate accounts.[10]

The sole point of disagreement arises from the commis-

---

[10]It appears to the court that, in allocating each of three categories of additional tax depreciation between intrastate and interstate accounts, the commission has employed three distinct methodologies. The excess of accelerated depreciation over guideline depreciation for pre-1970 property was allocated on the basis of the ratio of intrastate to interstate rate base (approximately 70:30). The same figure for post-1969 additions was allocated entirely to the intrastate side of the ledger. Finally the excess of book over guideline depreciation was allocated almost, though not quite, entirely to interstate (approximately 90:10).

Little is offered by any party to these proceedings to explain this disparate treatment of similar accounts. The state's bare assertion that identification of specific assets with specific company functions was impossible in this case is hardly instructive and the company's protestations that tax benefits have been flowed through to its retail customers in the past seems fairly irrelevant. It is, therefore, with some confusion that we approach this problem. As we stated earlier, the parties differ only as to the disposition of the latter portion of additional tax depreciation, that is, the excess of book over guideline depreciation, and no issue has been made of the other allocations. On this basis then we feel free to examine the disputed sums in isolation from those, which, though contradictory in their formulation, are undisputed.

sion's treatment of the difference between guideline and book depreciation for the test year. Because certain federal environmental regulations will have forced the premature retirement of certain of the company's facilities by 1982, the company was forced also to accelerate its book depreciation of those facilities. This resulted in book depreciation exceeding guideline depreciation and thus a negative entry was required for this portion of additional tax depreciation in the amount of $1.069 million. In its filing, the company sought to have this entire sum offset against the aggregate difference between tax and book depreciation. The net result of the company's approach would have been to decrease the company's intrastate tax deduction thereby producing an inflated intrastate tax expense. Naturally, such increased expense would have been reflected in higher rates.

The commission's resolution of the dispute involving the allocation of these sums was relatively simple. It adopted the view proffered by the council's witness that because most of the excess of book over guideline depreciation was attributable to the generation plant in Providence, Rhode Island, and because this plant is identified as a part of the electric system's interstate rate base, $967,000 of the excess must be excluded from the company's intrastate cost of service. Consequently, only the remaining $102,000 of the proposed $1.069 million was allocated to offset the aggregate difference between accelerated and guideline depreciation of intrastate rate base. The resulting higher tax deduction precipitated a lower tax liability on intrastate rate base and thus a lower cost of service than the company would like to have had approved.

The gravamen of the company's objection to this portion of the report and order is that, although the production facilities in Providence are interstate in character, its intrastate customers have, in past years, benefited by a

flow through of construction tax benefits and the usual excess of guideline over book depreciation. The company maintains that it would be inequitable at this point to shift the burden of tax liabilities to its only interstate customer, NEPCO, when that entity has never been the beneficiary of the company's past favorable tax status.

In a more speculative vein, the company alleges that the FPC will probably not allow this shifting of burdens from intrastate to interstate customers and, thus, that the ultimate tax burden will fall upon the company's security holders, presumably in the form of reduced dividends.

Because utilities and their regulatory overseers rarely indulge in simplicity, that characteristic, when ascribed to a particular regulatory methodology, is not necessarily a vice. Thus, unless the company shows that the commission abused its discretion, we cannot fault the commission's chosen method of allocating the excess book over guideline depreciation strictly on the basis of the percentage of that figure attributable to interstate power generating facilities. The company's attempt to invoke the aid of equity to alleviate the burden that this allocation of tax liabilities precipitates upon its sole interstate customer in no way undermines the presumed reasonableness that the commission's decision on this point enjoys. The commission reached its result on the basis of undisputed legal evidence both as to dollar amounts and as to inter/intrastate ratios. These findings were set forth in specific language in the report and order and they provide a specified and reasonable basis for the result reached. *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. 271, 277, 302 A.2d 757, 762 (1973). That part of the company's petition regarding the allocation of additional tax depreciation is, therefore, denied.

### IV. Interest Expense Deduction from the Company's Federal Income Tax Requirement

The next question raised by the company is whether the commission erroneously included in its calculation of the company's federal tax requirement a deduction for the interest expense which arose as a consequence of a post-test year bond issue.

In calculating its federal tax liability, the company is entitled to an income deduction for its interest expense. In the present case, the company sought to include in its interest expense deduction only the actual interest expense incurred by it during the test year. The council rejected this approach and suggested the inclusion in the account of "the forward looking interest expense based on the actual cost of outstanding debt pro-formed to accommodate the annualized expense of the April, 1975 bond issue of $15,000,000, and the retirement of $7,500,000 of debt during 1975." In adopting the latter position, the commission described the issue as being whether the change in interest expense based on already-determined capital structure (that is, including the 1975 bond issue) over actual expense in the test year is sufficiently "known and measurable" to warrant its inclusion in the calculation of the company's taxes. The commission held that the change in interest expense was known and measurable and that there was "no element of speculation involved." Thus, it arrived at a *total* interest expense figure of $7,642,000.

The company attacks the inclusion of post-test-year interest expense as being hypothetical and suggests that the commission's decision in this regard runs counter to our own decision in *Rhode Island Consumers' Council* v. *Smith*, 113 R.I. 384, 395-96, 322 A.2d 17, 23-24 (1974). That is, the company reads that decision to state that only those expenses actually incurred may be included in the company's tax deduction.

We believe that the company misstates the thrust of the relevant portion of our decision in *Rhode Island Consumers' Council* v. *Smith, id.* That case involved a dispute over what types of interest expense are properly included as deductions from taxable income. Specifically, the parties therein debated whether interest expense on short-term debt qualified as a deduction or whether the company would prevail in its method of excluding such debt from its capital structure. *Id.* at 395-96, 322 A.2d at 23-24. This is to be contrasted to the instant case wherein there is no dispute as to deductibility of the interest expense arising from the 1975 bond issue. The only issue herein is whether that interest expense, having been incurred subsequent to the test year, should be reflected as a pro forma adjustment to test year calculations.

Ratemaking, by its very nature, is prospective and in order to neutralize the negative effects of speculation and guesswork about future economic conditions, it is accepted practice to base future rates upon known past and present conditions through the use of data gathered during a specified test period. *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 278, 302 A.2d 757, 763 (1973). This process of prognostication creates a conflict between the need to lend some finality to ratemaking by utilizing a well-defined, finite test period and the need to base calculations upon the latest available relevant data which often pertains to time periods other than the test period. *Duquesne Light Co.* v. *Pennsylvania Pub. Util. Comm'n,* 174 Pa. Super. 62, 69, 99 A.2d 61, 64 (1953). A satisfactory resolution of this conflict is that when known and measurable post-test-year changes affect with certainty the test-year data, the commission may, within, its sound discretion, give effect to those changes. *Rhode Island Consumers' Council* v. *Smith,* 113 R.I. 384, 393, 322 A.2d 17, 22 (1974). Regarding the inclusion of relevant data other

than that which pertains directly to a utility's test-period experience, it has been observed that:

> "If the test period used does not reflect the present operating experience of the company *and the reasonably expected future economic conditions which the company will be confronted with,* or if adjustments in the test period are not made so as to take these two factors into consideration and give effect to them, then the rate-making process does not and cannot become an honest and intelligent forecast of probable conditions of the company in and during a reasonable period in the immediate future." (Emphasis added.) *Southern Bell Tel. & Tel. Co.* v. *Tennessee Pub. Serv. Comm'n,* 17 P.U.R.3d 311, 319 (Tenn. Ch. Ct. 1957).

We believe, therefore, that the commission has broad discretion in making pro forma adjustments to test-year data provided that there is substantial evidence in the record warranting its action. *Pittsburgh* v. *Pennsylvania Pub. Util. Comm'n,* 182 Pa. Super. 551, 560, 128 A.2d 372, 376 (1956).

The company has not demonstrated an abuse of discretion in this case. The issuance of $15 million in bonds and the retirement of $7.5 million of debt constitutes a significant change in the company's capital structure which will obviously create an escalation of the company's interest expense presently and in the near future. The commission, employing the method proffered by the council's witness, computed an amount of interest expense based upon the capital structure of the company *at that time* as used by the company's own witness in his testimony before the commission. The commission felt that this approach did not yield speculative results, and in the absence of something more than the naked assertion by the company that the interest figure is "hypothetical," we are constrained to agree. The commission's determinations in these matters are presumptively reasonable and will not be interfered with unless the company satisfies us by clear and convinc-

ing evidence that it is clearly, palpably and grossly unreasonable. *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 295, 302 A.2d 757, 772 (1973). The company has come forth with no such showing in this case. In fact, it appears to the court that this adjustment to test-year data is just the sort of known and measurable future economic condition of which the authorities overwhelmingly approve. We find no error in the interest expense deduction as determined by the commission.

## V. Normalization of Tax Benefits

The next question raised by the company's petition concerns whether the company will be permitted to adopt the accounting procedure of normalizing certain tax benefits which accrue as the result of construction overhead and interest on construction debt, or whether these benefits will, as they have in the past, be flowed through so as to be reflected currently in lower rates.

After noting the arguments for and against the proposed revision of accounting methods, the commission characterized its choice between the interest of the company in improving its internal cash flow and the interest of the ratepayers in being charged the lowest possible rates as a "purely judgmental exercise." In its judgment, "the economic conditions extant in the State of Rhode Island today," including high unemployment and already high electric rates, constrained it to opt in favor of the consumer and to reject the proposed normalization accounting.

It is settled that, when reviewing the commission's decisions, our concern is not with the method used to attain a particular result but with the fairness and reasonableness of the end result itself. *FPC* v. *Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 287-88, 88 L.Ed. 333, 344-45 (1944). And it is true that the determination that a result is fair and reasonable requires a balancing of investor and consumer interests. *Id.* at 603, 64 S.Ct. at 288,

88 L.Ed. at 345. This general formula does not, however, absolve the commission of its primary responsibility to fairly and substantially support its findings by legal evidence and to make such findings sufficiently specific to enable this court to ascertain whether the underlying facts afford a reasonable basis for the result reached. *Town of Jamestown* v. *Kennelly,* 81 R.I. 177, 180-81, 100 A.2d 649, 651 (1953). Thus, even if we were to draw every fair and reasonable inference from the facts recited in this portion of the report and order, it is our belief that the commission has not met its burden in this matter. We had occasion to observe recently that a mere recitation of well-known economic facts of life constitutes no more than a description of the state of the economy and does little to provide an evaluative insight into the reasonableness of a utility company's proposals — in this case, the propriety of normalizing tax benefits. *New England Tel. & Tel. Co.* v. *Public Util. Comm'n,* 116 R.I. 356, 364, 358 A.2d 1, 13 (1976).

We, therefore, hold that the treatment given this proposition by the commission was deficient. The matter of normalization of tax benefits is remanded to the commission for supplemental consideration, perhaps in the light of the division's own arguments under the present petition.

## VI. Attrition Allowance

The commission rejected the proposed inclusion, in the company's rate of return, of an attrition adjustment of 2.1% over and above the requested 15.3% return on equity, which, with various adjustments for taxes, amounts to an additional $1.846 million in the cost of service for the test year. Fundamentally, the company's position is that factors such as inflation and various lags in revenue collections have created an attrition of earnings in recent years and that its rate of return should be adjusted to account for such attrition as is likely to occur in the future.

Attrition or erosion of earnings has been described as:

"* * * the lessening or diminution of a rate of earnings caused by and resulting from the addition of plant at a cost higher than the cost for similar additions at the time rates were last established. It results directly from the fact that new additions to plant at a cost higher than the previous average produces a new cost greater than the old while the rate of return previously established is related to (but not based upon) the old, or lower cost." *Re Baltimore Gas and Elec. Co.,* 24 P.U.R.3d 247, 256 (Md. P.S.C. 1958).

While recognition of erosive trends is a relatively recent development, it is now generally conceded that where such attrition has been clearly demonstrated by a utility company, an adjustment to that company's rate of return is appropriate. 1 Priest, *Principles of Public Utility Regulation* at 204 (1969); see *Legislature of the County of Rockland* v. *New York State Pub. Serv. Comm'n,* 49 App. Div.2d 484, 487, 375 N.Y.S.2d 650, 652 (1975).

The most often-cited reasons for allowing these adjustments are: (1) the utility company has a need to earn a fair rate of return for a reasonable period in the future, *Re Mountain States Tel. & Tel. Co.,* 7 P.U.R.3d 115, 119 (Ariz. Corp. Comm'n 1954); (2) continued erosion of earnings harms the public interest insofar as poor earnings require the utility to go into the money market in a disadvantageous position, *Re Public Serv. Co.,* 34 P.U.R.3d 186, 216 (Colo. P.U.C. 1960); and (3) the inability of the utility to earn a fair rate of return for substantial periods of time tends to cause each rate case to follow closely upon the heels of the next previous rate increase. *City of Lynchburg* v. *Chesapeake & Potomac Tel. Co.,* 200 Va. 706, 715, 107 S.E.2d 462, 469, 28 P.U.R.3d 368, 375 (1959); *State* v. *New Jersey Bell Tel. Co.,* 30 N.J. 16, 27-28, 152 A.2d 35, 41-42, 29 P.U.R.3d 87, 93 (1959).

This court has acknowledged the commission's duty to recognize erosive trends in determining whether to permit

a company to collect its requested rate relief, *Rhode Island Consumers' Council* v. *Smith,* 113 R.I. 232, 247, 319 A.2d 643, 651 (1974), but we have stated also that the commission's chosen method of compensating for such erosion enjoys a presumption of reasonableness and that its decision on such matters will be allowed to stand absent a convincing showing to the contrary. *New England Tel. & Tel. Co.* v. *Public Util. Comm'n,* 116 R.I. 356, 391, 358 A. 2d 1, 11 (1976). And it follows from this that where, as in the present case, the commission denies all relief of this sort, the decision is presumptively reasonable and the burden is upon the company to show by clear and convincing evidence that it is clearly, palpably and grossly unreasonable. *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 295, 302 A.2d 757, 772 (1973). We turn now to an examination of the arguments and the evidence upon which they are based to determine if such a showing has been made.

In this case, the commission's refusal to adjust the company's rate of return to reflect an attrition factor is based upon two major premises. The first is that there are offsetting factors appearing in the record, which tend to absorb and therefore neutralize the projected effects of erosion. The commission maintains, and correctly so, that the rate of return is not a guarantee that earnings will attain that particular level. The company's earnings, in response to various factors in the economy, may fall short of the rate of return or they may possibly exceed it. The commission, after making a vague reference to the company's performance this year, indicated that the latter "might be the case" for this company this year. Additionally, the commission indicated that a recent work stoppage at the company raised the "possibility" of a windfall of profits for the company and that, even prior to the strike, the company and NEES experienced a "great surge

in earnings." On these bases, the commission substantiated its belief that the adjustment for attrition was "theoretically suspect."

The commission's second premise was that the company's calculation of the proposed adjustment was wholly invalid. Specifically, the commission pointed out the fact that the company's reliance on certain figures to support its proposed attrition adjustment was inconsistent with its previous rejection of those same figures as a measure of the company's earnings. The commission partially adopted the company's earlier view in holding that the calculation was of "too questionable a nature to support the adjustment" for attrition.

To support its general claim that the commission acted arbitrarily and abused its discretion in this regard, the company retorts that there are no findings in the record which indicate the likelihood of a significant windfall resulting from the work stoppage and that the actual impact of the strike could not have been ascertained at the time the report and order was issued. By way of affirmative rebuttal, the company poses the hypothesis that the higher wages which will be paid under the new union contract might result in higher costs for construction and maintenance projects which were necessarily deferred for the duration of the strike. While the company admits this to be speculation, it maintains that it is no less so than the commission's own suppositions.

In response to the commission's findings regarding the "surge" in the company's and NEE's earnings, the company cites the fact that, in its own case, it still showed a revenue deficiency of $10 million for the test year. It states further that NEES is not requesting rate relief in these proceedings and that the state of its earnings is fairly irrelevant.

Finally, the company alleges that, in its analysis of the

company's calculations of attrition, the commission misread and misconstrued the evidence relied upon and that, contrary to the commission's findings, the figures relied upon support rather than undermine the calculations.

We note initially that the commission's method of specifying those offsetting factors tending to eliminate the effects of attrition, is recognized as a valid regulatory approach. 1 Priest, *Principles of Public Utility Regulation* at 204-06 (1969), *citing Southwestern Bell Tel. Co.* v. *State Corp. Comm'n,* 192 Kan. 39, 84, 386 P.2d 515, 553, 51 P.U.R.3d 113, 155 (1963). While the burden is upon the company to present evidence that these offsetting factors are less than sufficient to neutralize the effects of erosion, 1 Priest, *supra* at 204, the burden falls upon the commission in the first instance to support its conclusions with legal evidence sufficiently specific to enable us to ascertain if the facts upon which those conclusions are premised afford a reasonable basis for the result reached. *Town of Jamestown* v. *Kennelly,* 81 R.I. 177, 180-81, 100 A.2d 649, 651 (1953).

We are not satisfied that either side to the instant controversy has satisfactorily shouldered its burden. We do, however, appreciate the fact that, at the time this matter was under consideration before the commission, the long- and short-term effects of a major work stoppage could not have been foreseen. Because it appears that the economic aftershock of the strike will have a significant effect on the company's future earnings and, in turn, upon the projected attrition of those earnings, and because the case will be remanded to the commission for reconsideration of other matters, we remand this portion of the case for reconsideration in the light of more up-to-date information regarding the residual effects of the strike.

We next consider the matter of the company's having experienced a "surge in earnings." In this case, the com-

mission expressly relied upon evidence that the company's earnings on common equity had increased substantially between the calendar year 1974 and the first quarter of 1975. While we concur in the commission's finding that an increase in earnings on common equity tends to offset whatever attrition to earnings the company has experienced, its effect upon the rate of return, like the effects of the work stoppage, may be better evaluated in light of the company's actual operating experience since the commission rendered its report and order. *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 298, 302 A.2d 757, 773 (1973). We, therefore, remand this question to the commission in light of the company's growth-in-earnings pattern since the commission issued its report and order in this case. What we said about the residual effect of the strike applies with equal force to the company's surge in earnings.

With regard to the disputed use of certain calculations by the company in support of its proposed attrition adjustment, we cannot discern from the fact of the report and order the precise reason why the company's calculations were considered suspect. All that is supplied is a concession that those calculations are not totally invalid coupled with the assertion that they are "of too questionable a nature to support the adjustment." From this we are unable to conclude whether or not those calculations may form a basis for disallowing the attrition adjustment. We, therefore, remand this matter for reconsideration and a supplementary decision. *United Transit Co.* v. *Nunes,* 99 R.I. 501, 504-05, 209 A.2d 215, 217-18 (1965).

## VII. *The Rate of Return*

The rate of return allowed to a utility company is the percentage by which that company's rate base is multiplied in order to determine the revenues needed to pay expenses and to acquire investment capital. To calculate

the rate of return, the costs of each component of capital, *viz.*, debt, preferred stock and common equity, are weighted according to the ratio that each bears to the total capital structure of the company, and the resultant figures are added together to yield a sum which is the rate of return.[11] This rate must be reasonable and just and must look toward the immediate future as well as to the moment. Thus, a utility is permitted an opportunity to earn a return on the value of property utilized for the public convenience equal to returns generally achieved at the same time and in the same general part of the country on investments in other enterprises having corresponding risks and uncertainties. *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. 271, 292-93, 302 A.2d 757, 770 (1973). This court has also adopted the standard for reviewing the reasonableness of an allowed return as promulgated by the United States Supreme Court in the *Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), that a return should be sufficient to permit the utility "* * * to maintain financial integrity, attract necessary capital, and fairly compensate [its] investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable." *Id.* at 792, 88 S.Ct. at 1373, 20 L.Ed.2d at 350.

Because the returns to investors in preferred stock and debt are contractually fixed at predetermined levels, the most controversial element of the rate of return is, in most cases, the return on equity. *Narragansett Elec. Co.* v. *Kennelly*, 88 R.I. 56, 83-84, 143 A.2d 709, 725 (1958). This arises, of course, from the fact that common stock pays no

---

[11]The rate of return in this case was computed as follows:

| Type of Capital | Capital Structure | Cost Rate | Weighted Cost |
|---|---|---|---|
| Debt | 53.7% | 7.17% | 3.85% |
| Preferred Stock | 13.4% | 5.82% | .78% |
| Common Equity | 32.9% | 12.5% | 4.11% |
| | Composite Cost of Capital | | 8.74% |

fixed yield but only dividends which, if they are paid at all, are paid in an amount and at a time specified by the company's management. Nichols and Welch, *Ruling Principles of Utility Regulation, Rate of Return,* Supp. A at 222-23 (1964). The instant case presents no exception to this general pattern in that the only dispute with regard to the rate of return herein centers around the cost of equity.

The company's witnesses at the hearing below calculated an overall rate of return of 9.68% based in part on a proposed return on equity of 15.3%. This latter figure was derived from a complicated statistical analysis which compared the company's performance with that of some 90 other companies on the basis of 49 correlated variables. We will make no attempt to evaluate the utility of the company's approach but note only that the commission discarded it as being nonpredictive and without theoretical basis. The commission opted instead for the so-called Discounted Cash Flow method employed by its own witness which yielded a return on equity of 12.0% assuming no need in the near term future for equity financing or 13.5% if such financing were to become necessary. Since the record contained testimony by company witnesses that neither the company nor NEES[12] would require equity financing in the near future, the commission chose the 12.0% figure. Citing what it regarded as fairness to the company's existing or "captive" investors, the return on equity was finally pegged at 12.5%, the rate which had been allowed since the previous rate case.

While the report and order contains a statement to the effect that the choice of a 12.0% cost of equity was based

---

[12]The commission rejected the suggestions of both sides of this controversy that the capital structure of NEES be used in calculating the rate of return. Thus, the commission used only the company's capital structure including debt services on short-term obligations. *See* note 11 *supra.*

upon evidence that no new equity financing was necessary in the near future, the true basis of the conclusion reached in this respect was somewhat obscured by the inclusion of an addendum of sorts which sets forth additional reasons for minimizing the allowed return on equity. Responding to its duty under the *Hope*[13] and *Bluefield*[14] decisions, the commission claimed to have reviewed all the relevant evidence and to have taken into consideration, "all the interests it is [its] duty to guard." Specifically, the commission took notice of the fact that construction of new plant has brought the company to a point where it has an excess capacity of 20 to 40%. The commission thereupon decried the alleged need for construction financing. The commission also seized this opportunity to unburden itself of its adamant opposition to unnecessary growth of utilities. Secondly, the commission noted that the state of the economy and the resultant inability of some consumers to pay increased rates are such that any upward pressure on the rate of return should be resisted. Lastly, the commission stated that after a rather poor performance during 1974, the company has resumed a normal growth-in-earnings pattern and that this fact supports its conclusion that the existing return on equity of 12.5% is just and reasonable.

The company's objections to this facet of the decision are twofold. First, the company strenuously objects to any reliance whatsoever upon the consumer's ability to pay for services rendered, echoing the by-now familiar expression that "utility companies are not eleemosynary institutions." Second, the company argues that to differentiate between enterprises that will require equity financing and those

[13]*FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

[14]*Bluefield Water Works & Improvement Co.* v. *Public Serv. Comm'n*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923).

that will not has the effect of luring investors in only to penalize them when they have done so; and that any ongoing enterprise has a continuing need to raise capital to support its construction program.

The rate of return allowed by the commission in a given rate case is entitled to a presumption of reasonableness until the company comes forth with clear and convincing evidence that it is clearly, palpably and grossly unreasonable. *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 295, 302 A.2d 757, 772 (1973). So too, the commission is permitted broad discretion in its choice of methodology and that choice will not be disturbed as long as the end result is fair and reasonable. *New England Tel. & Tel. Co.* v. *Public Util. Comm'n,* 116 R.I. 356, 386, 358 A.2d 1, 19 (1976).

Applying these standards of review to the instant matter, we will not, as we have not in the past, second-guess the commission's choice of the Discounted Cash Flow method of fixing a return on equity. Thus, insofar as the 12.5% return reflects the proper considerations which that method imports and insofar as that figure represents a reasonable return on equity, it will not be disturbed. While we can appreciate the relevance in determining the cost of equity of excess plant, *see Ex Parte Reserve Tel. Co.,* 16 P.U.R. 3d 197, 201 (La. P.S.C. 1956), and the recent resumption of normal earnings growth, we are troubled by the commission's reliance, in this narrow sphere, upon the consumers' *ability* to pay for services rendered.

It is indeed true that the commission's work is affected with a public interest, G. L. 1956 (1969 Reenactment) §39-1-1, and that the commission is entrusted with a broad charter to be ever mindful of the needs of the consumer as well as of the investor. *Permian Basin Area Rate Cases, supra* at 792, 88 S.Ct. at 1373, 20 L.Ed.2d at 350; *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 293, 302

A.2d 757, 770 (1973). However, it is well settled that, with regard to fixing a rate of return, the appropriate manner in which to protect consumer interests is for the commission to assure that the utility company is permitted to earn a return no greater than is necessary to maintain the financial health of the company. That is, the consumer is treated fairly if he pays no more than the cost of the service that has been rendered to him including a reasonable profit. *Re Potomac Elec. Power Co.*, 83 P.U.R.3d 113, 143 (D.C. P.S.C. 1970).

The foremost expression of the law in this respect was provided by the Washington Supreme Court in 1934, a time at which consumers were in more dire straits than today's electric power consumers. That court stated that

"* * * public service companies are not eleemosynary institutions, and they cannot be compelled to devote their property to a public use except upon the well-recognized basis of a fair and reasonable return therefor. Through general taxation only, in common with all taxpayers, can they be compelled to contribute to the relief of the distressed." *State ex rel. Puget Sound Power & Light Co.* v. *Department of Pub. Works*, 179 Wash. 461, 468, 38 P.2d 350, 353, 7 P.U.R. (n.s.) 14, 19 (1934).

We agree with these principles and hold that, in this case, the commission has erred in relying upon the ability of consumers to pay for services in setting a cost of equity. However, as we stated earlier, the report and order is somewhat vague in specifying the exact extent to which each of the named factors influenced the ultimate choice of 12.5% as a cost of equity. Inasmuch as the inability of consumers to pay the cost of service is the only criterion suffering a fatal infirmity, the matter of the return on equity is remanded for a clarification of the commission's position in this respect and, if necessary, an appropriate adjustment in the cost-of-equity figure.

This holding should not be read to import that local economic conditions do not have a bearing in establishing an appropriate return on equity. We have already stated that the process of fixing a return on equity is a process of comparing the company being examined with other similar enterprises having similar risks. Thus, the cost of equity is very much a measure of the desirability of the company's stock as an investment opportunity and local economic conditions, including employment, population and standard of living, have a significant impact on investor confidence. *Re Diamond State Tel. Co.*, 21 P.U.R.3d 417, 436 (Del. P.S.C. 1958). Our only statement in this case with regard to local conditions is that specific reliance by the commission on the consumers' *ability* to pay is error.

### Conclusion

The company's petition for certiorari as it relates to the following topics is denied: I. The Roles of the Attorney General and the Commission; II. Cash Working Capital — Purchased Power Expense; III. Allocation of Additional Tax Depreciation; and IV. Interest Expense Deduction from the Company's Federal Income Tax Requirement.

The company's petition for certiorari as to the remaining topics is sustained: V. Normalization of Tax Benefits; VI. Attrition Allowance; and VII. The Rate of Return.

The records certified to this court are ordered returned to the commission. As to topics V, VI and VII, the commission should reconsider the testimony in the present record supplemented by such further testimony as may be offered pursuant to the petition of any party or by its own direction or as may be required to fulfill the directives of this opinion, and it should then make further findings and orders in harmony with this opinion. Any party thereafter dissatisfied may, by filing a motion in this court within 7 days following the commission's action, bring the

matter before us for further consideration. In that event it will be set down for argument upon the briefs now before us and upon such supplemental record and briefs as may be required. Jurisdiction for the review of the commission's supplementary decision and amended order is retained in this court.

*Edwards & Angell, Edward F. Hindle, Knight Edwards, Deming E. Sherman,* for petitioner.

*Julius C. Michaelson,* Attorney General, *R. Daniel Prentiss,* Special Asst. Attorney General, for Public Utilities Commission.

*Roberts & Willey Incorporated, Dennis J. Roberts, II,* for Rhode Island Consumers' Council.