352 A.2d 630.

PROVIDENCE GAS COMPANY *vs.* PUBLIC UTILITIES COMMISSION.

FEBRUARY 27, 1976.

PRESENT: Paolino, Acting C. J., Joslin, Kelleher and Doris, JJ.

KELLEHER, J. This statutory petition for certiorari was filed pursuant to the pertinent provisions of G. L. 1956 (1969 Reenactment) §39-5-1. Consequently, we are bound to review the Public Utilities Commission's denial of a proposal that would have increased the cost of natural gas for a certain class of consumers in the Newport area. The petitioner is the Providence Gas Company. The proposed increase was originally sought in a revised rate schedule that was filed by the Newport Gas Light Company on March 27, 1974. The increase was due to become effective 1 month later. However, the Public Utilities Commission invoked the terms of §39-3-11 and suspended the effective date pending its consideration of the application. Hereinafter, we shall refer to the Providence Gas Company as "Providence," the Newport Gas Light Company as "Newport," the Public Utilities Commission as "the commission," the Division of Public Utilities and Carriers as "the division," and the Rhode Island Consumers' Council

as "the council." Occasionally, we shall refer to the administrator of the division as "the administrator" and sometimes as "the chairman" because he is, by reason of §39-1-3, ex officio chairman of the commission.

The record certified to us indicates that on June 27, 1974, Newport filed a second revised rate schedule in which it used as its test year the period ending the previous April 30. This revision, if accepted, would increase Newport's annual gross revenues by approximately $223,000 and establish the utility's rate of return at 9 percent. The commission held a day-long hearing in the city of Newport on September 4. The witnesses at this time were Newport's executive vice president and a consulting engineer. Both witnesses were subject to cross-examination by the commission and the attorney for the council. The vice president told of the cash crunch his company was experiencing. He attributed the utility's problem to the inflationary spiraling of costs, the consumer's conservation of heat and the recent closing of several naval installations in the Newport-Middletown area. The engineer was appearing for the first time as an expert. He was allowed to present the commission with his opinion that the rate of return being sought was reasonable. The commission chairman recessed the hearing with the observation that further testimony would be taken and developed.

On October 31, 1974, Providence and Newport filed a joint petition with the division asking that approval be given to an agreement whereby Providence would purchase from Newport substantially all of Newport's assets, properties and business. When the council learned of the pending negotiations, it wrote to the administrator and asked that a public hearing be held on the joint petition. In taking this position, the council relied upon §39-3-25 which gives the administrator sole discretion as to whether or

not a hearing should be held concerning the acquisition of one utility by another.

The administrator denied the request for a public hearing and on December 26, 1974, he issued an order in which he gave his consent and approval to the acquisition of Newport by Providence. His order also bears the signatures of the remaining members of the commission, Edward W. Burman and John J. Wrenn. In giving his approval, the administrator noted

"that applications for rate increases are in no way affected by this order, and that the decision of the Public Utilities Commission with respect to any rate application, whether now pending or hereafter filed, will be made in light of conditions brought about by this Approval and the circumstances prevailing at the time."

In a letter which accompanied the order and was addressed to the president of Providence, the administrator noted the pendency of Newport's rate application and informed the addressee that it not only would be processed as an application of the "Newport Division of the Providence Gas Company" but it would be "decided on the relative financial data in effect subsequent to the acquisition of Newport by Providence."

Providence's joy at the acquisition of its new division lasted but a few months. On April 30, 1975, the commission rejected in toto the increase which had been sought originally by Newport. In its denial, the commission referred to the earlier representations made by Providence and Newport as to the economies which would be realized by their consolidation and also noted that Providence had purchased Newport for a price substantially lower than Newport's book value. Additionally, reference was also made to the announcement by Providence that it was preparing to seek commission approval of a new schedule of tariffs which would encompass its entire operation. The

commission stated that it would act with all possible dispatch, once Providence presented its new application.

In these proceedings, Providence has launched a multifaceted attack against the commission's denial of its Newport application. It urges us to enforce the December 1974 "commitment." It claims that the denial violates its due process rights because the evidence in support of the rate increase was uncontradicted. Finally, it argues that since the April 1974 suspension order had expired by its terms, in October, the new rates were already in effect in April 1975.

There is no merit to any of these contentions.

Before dealing with Providence's commitment theory, we should point out that the litigants and, yes, even the administrator, were confused as to what hat he was wearing when they corresponded with him, when he wrote to them, or when he issued orders. Some of the confusion was also shared by his colleagues on the commission.

Jurisdiction to give consent and approval to one utility's purchase of another utility's property is vested solely in the *division* not the *commission*. The division acts through its chief executive officer, the administrator. To be precise, any correspondence relating to the acquisition application should have been addressed to the *administrator* not the *chairman*. The signatures of the two commission members on the consent and approval order add nothing to its legal efficacy. Apart, however, from the confusion over which hat the administrator was wearing at any given time, the record gives absolutely no support whatever to Providence's contention that the commission had committed itself to approve a request for increased rates which had been filed and heard in part long before any word was heard of the proposed takeover.

At the September hearing, the commission chairman, in reviewing the company's exhibits, pointed out several

matters of concern to Newport's vice president. The chairman noted the "sizable increase" in the utility's receivables and the witness agreed to give serious consideration to the imposition of a service charge for late payments. The witness also conceded that he had failed to determine if the suggested rate of return was commensurate with that being made by other business enterprises which are faced with similar risks and uncertainties. There was also a discussion as to whether the cash flow could be increased by the sale of a manufacturing plant owned by Newport, provoking the vice president's acknowledgement that no serious effort had been made to dispose of this property. The commission chairman also informed him that this court refused to allow any "rule of thumb" computation as to the amount of money necessary for cash working capital. The chairman was of course referring to our holding in *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 289, 302 A.2d 757, 769 (1973). The witness acknowledged that this was a matter that would have to be further investigated. Finally, the chairman expressed his doubt as to whether the proposed schedule treated the residential consumer in an equitable manner.

Even if we assume that the signatures appearing on the December 26 consent and approval order and on the letter sent out to Providence's president constitute a commitment, the commission did keep its promise. Actually, the order and the correspondence told Providence that the individual members of the commission, in their evaluation of the evidence presented by Newport, would also consider the impact on the rate structure caused by the takeover of a larger and more viable utility. Indeed, when the council was urging a public hearing on the joint petition, Newport and Providence were stressing the need for an expeditious treatment of their petition so that the sale could take place in 1974 thereby indirectly passing along

to Newport's consumers benefits which because of a tax loss were estimated to be nearly $80,000. In *Rhode Island Consumers' Council* v. *Smith,* 113 R. I. 384, 392-93, 322 A.2d 17, 22 (1974), we recognized that the commission has a certain amount of expertise in matters within the ambit of its responsibility and therefore could "take 'administrative notice' of what is generally accepted in the market place as fact." The council was well aware of the representations made by the two utilities in their joint effort to have a 1974 withdrawal by Newport from the gas industry. The acquisition cast yet another shadow on the already cloudy rate picture which had been painted at the September hearing. The commission quite properly gave the package put together by the utilities a chance to prove itself, but the promised benefits had not manifested themselves before Providence announced that it would go before the commission and seek more revenue for the services it was rendering to its customers, including those in the Newport region. The commission did keep its commitment and, as will be seen, acted quite properly.

Once the takeover took hold, all interest in resolving the issues which were raised at the September hearing seemed to have waned. The record indicates that in early November 1974, a consulting firm hired by the council was seeking supplemental data from Newport to test the accuracy of the computations which had been presented by the utility. However, there is an absence of anything in the record which shows that Providence or Newport made any effort whatsoever to resolve the issues raised at the public hearing.

The Legislature has assisted us by already stating the most elementary proposition. "At any * * * hearing involving any proposed increase in any rate, toll or charge, the burden of proof to show that such increase is necessary in order to obtain a reasonable compensation for the

service rendered shall be upon the public utility * * *."
Section 39-3-12.

On the record presented to us, it is our belief that what the commission did was correct because Newport originally and Providence subsequently had both utterly failed to sustain their burden of proof.

There is evidence that supports the denial and there is no denial of due process.

As we come to Providence's ingenious argument that the commission lost its jurisdiction to consider the new tariff because the April 1974 suspension order had expired, we would first delineate the terms of the statute, §39-3-11, which authorizes the commission to issue an order which suspends the operation of any proposed rate increase.

In essence, this statute provides that no change shall be made in any utility rate, toll or charge until 30 days after notice of the proposed change has been given to the commission. Once the commission is notified of the proposal's pendency, it is required to hold a public hearing and to make an investigation as to the proposal's "propriety." The commission can suspend the effective date of a proposed change for an additional period of up to 6 months. During this interval, the investigation and the hearing can begin. If the hearing and/or the investigation have not been completed at the expiration of 6 months, the commission can further extend the suspension period for an additional 3 months. Once the hearing is completed, the commission is required to issue an appropriate order within the next 90 days.

Providence, in tracing the numerous orders entered in the Newport rate case, points out that the only suspension order issued by the commission is dated April 25, 1974, and that this order terminated on November 1, 1974. The position taken by Providence, if sustained, would pose the quandry: What rates became effective in November 1974?

The rates set forth in its March tariff or the revised rates described in the June tariff? The answer is neither.

The position taken by Povidence comes just a little bit too late in the game. A proceeding which seeks to determine the rates sought by a regulated monopoly, also called a public utility, is a matter that is steeped with public interest. At no time when this matter was pending before the commission did Newport, or the Newport division of Providence, ever advise anyone that it planned to put into effect its proposed increases. If they had, the commission could have taken appropriate action, such as coming down with a decision. It is obvious that neither utility was concerned about the suspension orders or the lack thereof; but each was engrossed in consummating the sale before the new year arrived. It is our belief that Providence, by its conduct and that of its predecessor, is now estopped from making the argument that its rates are now automatically in effect. Providence will not be allowed at this stage of the proceedings to switch positions when such a switch shall unquestionably prejudice the right of rate payers who must do business with its Newport division.

The petition for certiorari is denied and dismissed, and the records certified to us are returned to the commission with our decision endorsed thereon.

Mr. Chief Justice Roberts did not participate.

*Hinckley, Allen, Salisbury & Parsons, Thomas D. Gidley, Robert J. Ferranty*, Senior Vice-President, Providence Gas Company, for petitioner.

*Julius C. Michaelson*, Attorney General, *R. Daniel Prentiss*, Special Asst. Attorney General. *Roberts & Willey Incorporated, Dennis J. Roberts, II,* in behalf of Rhode Island Consumers' Council.