380 A.2d 1334.

PROVIDENCE GAS COMPANY *vs.* EDWARD F. BURKE, *Administrator, Division of Public Utilities and Carriers.*

DECEMBER 2, 1977.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

488

KELLEHER, J. This is a statutory petition for certiorari brought by the Providence Gas Company (the company) pursuant to G.L. 1956 (1969 Reenactment) §39-5-1, as enacted by P.L. 1969, ch. 240, §8, against the Administrator of the Division of Public Utilities and Carriers. The company asks that we reverse an order of the Public Utilities Commission (the commission) requiring the company to make refunds to certain of its customers in a manner contrary to the terms of the company's filed tariff. We

issued a stay of the commission's order pending a hearing and decision on the merits.

The record before us reveals that the company purchases gas from several interstate wholesale suppliers and distributes it to its Rhode Island customers. The company's major source of gas is the Algonquin Gas Transmission Company (Algonquin). Algonquin in turn receives its gas supply from another interstate supplier, Texas Eastern Gas Transmission Company (Texas Eastern). Both Algonquin's and Texas Eastern's activities are regulated by the Federal Power Commission (FPC). The FPC has a policy of permitting the requested rate increases of interstate suppliers to go into effect without any prior investigation with the proviso that if the proposed increase is ultimately denied or modified, the supplier will make the necessary refund to its distributors. In order to adjust the price it charges for gas by reason of such cost increases and refunds from its suppliers, the company has as part of its filed tariff a purchase gas price adjustment clause (PGA).

Such a clause usually provides for the fluctuation upward or downward of the rate charged to the consumer, reflecting, in accordance with a formula, changes in the company's cost of its purchased gas or, in the case of a utility supplying electricity, changes in the cost of the fuel it uses to generate power. As the utility's costs rise or fall, a corresponding increase or decrease in the prices charged to the consumer must occur. This is the reality of the marketplace. Otherwise, a utility runs the risk of becoming insolvent, or it may reap windfall profits. In a period of rapid increases in costs to the utility, solvency is a paramount consideration. At another time the situation may be reversed, and every effort must be made to avoid the windfall.

The device which has been fashioned to take care of either eventuality has been variously labeled as an "automatic adjustment clause," or "escalator clause," or "purchased gas adjustment clause," or a "pass-through pro-

cedure." However the clause is entitled, it becomes part of the utility's rate structure and serves to lessen the burden and expense to the utility, which would ultimately fall upon the consumer, of instituting and carrying out separate rate proceedings to justify the varying charges. *See Consumers Organization for Fair Energy Equality, Inc.* v. *Department of Pub. Util.*, 386 Mass. 599, 335 N.E.2d 341 (1975); *Montana Consumers' Counsel* v. *Public Serv. Comm'n,* 168 Mont. 180, 541 P.2d 770 (1975); *State ex rel. Util. Comm'n* v. *Edmisten,* 291 N.C. 327, 230 S.E.2d 651 (1976).

The PGA clause that is part of the company's filed tariff was first promulgated and approved by the commission in 1960, and it was last modified in 1976. By its terms, the automatic adjustment, either increasing or decreasing the price of gas, applies only to the acounts of the company's regular customers. By "regular customers" we mean those users who purchase gas for an indeterminate period, for example, the average home owner or apartment renter. Customers who purchase gas on a contractual, seasonal basis do not come within the reach of the PGA. The company, being bound by its contract, must absorb the supplier's price increase attributable to these users. Consequently, the company retains that portion of the refund which is attributable to the usage of the contract sales customers. The company's obligation to distribute refunds to the regular customers arises when it receives a refund from its supplier.

Once the toal amount to be refunded the regular customers is calculated, the PGA specifies that the company must determine a unit refund in terms of a Mcf (a thousand cubic feet) of gas. This is a simple process of taking the total amount of the refund available for distribution to the regulars and dividing it by the Mcf's of gas used by all the regular customers during the first 12 of the 13 months immediately preceding the date the company received the refund. The result of this computation is a figure expressed in

a monetary amount. For example, if the company has a refund available for distribution to the regular customers of $500,000 and during the designated 12 months 10,000,000 Mcf's of gas were consumed, the unit refund would be $.05 per Mcf ($500,000 ÷ 10,000,000 Mcf's). This method does not produce an exact measurement of what each customer was originally overcharged per Mcf purchased.[1] Rather, it is an estimate based upon a randomly selected 12-month period..

Having arrived at a unit refund, the company is directed by the PGA to apply this figure to customer bills commencing 15 days after receipt of the refund. Thus, the company simply makes a billing adjustment, and thereafter regular customers have their monthly gas bills reduced in price by the unit refund amount per Mcf of gas until the total dollars available for refund are exhausted. The price reduction is given to all regular customers while there is still refund money to be dispersed. If a person becomes a user of gas several months after the price reduction goes into effect, he may benefit by reason of the unit refund reduction in his monthly gas bill even though this is the first time he has used the utility's product.

Since the PGA provides for refunding through price credits, some customers who actually paid the excessive charges which are being refunded may not receive any benefit it they no longer use gas during the period when the credit is being applied. To illustrate, a family which used gas during the period when the supplier's cost increases were passed through to consumers but which has since moved to a house heated by oil or electricity would not receive a refund. By not being users of gas when the price

---

[1] An exact determination is not reached because the PGA price increase may have taken place years before the refund is received by the company. For example, in this case a portion of the refund is attributable to supplier overcharges dating back to May 1969.

reduction is being effectuated, the family is unable to benefit from the credit.

On April 12, 1976, the company received a $1,285,252 refund check from Algonquin. The company's accountants, after applying themselves to the task at hand, determined that the total amount of the rebate due the company's regular customers was $1,039,977. The $245,000-plus difference between the amount available for rebate and the $1,285,252 figure in Algonquin's check represents the additional cost the company had to absorb because of its contractual undertaking with the seasonal customers and is retained by the company. Once the $1,039,977 figure was reached, the company computed a unit refund in terms of a Mcf of gas.[2] After the computers had arrived at the unit refund figure, all the compnay had to do was comply with that portion of the PGA which states that the unit refund "shall be applied to customer's [sic] bills commencing fifteen days after the date of refund * * * ."

However, before the company could effectuate this goal, it received an April 22, 1976 letter from the chairman of the commission in which he referred to doubts that had been expressed as to whether the mechanics to be utilized in making the refund would result in "a full pass-through of the refund to customers." He also formally requested that the company file with the commission complete details concerning the refund and "your company's proposal for flowing that refund through to the retail customers."

The company, through its president, gave a reply in a letter dated April 26, 1976. In it the president informed the chairman that the company was following the formula set

[2]The unit refund to be credited on each Mcf of gas purchased was $.0676. The company arrived at this figure by dividing the amount to be refunded ($1,039,977) by regular customer usage during the first 12 of the 13 months preceding the date of the refund (15, 377, 802 Mcf's).

forth in the PGA. The chairman was advised that the refund check had been received on April 12, that the staff of the Division of Public Utilities and Carriers (the division) had been provided with the company's calculations, and that the 15-day period to commence making the refund was about to expire on April 27, the following day. Accordingly, the president asked the chairman whether the company should proceed with the rebate.

On May 3, 1976, the chairman responded by telling the company about (1) his distaste for the federal regulatory process; (2) his concern as to whether the tariff mechanism would result in refunds "to Providence's customers in the same proportion in which those customers contributed to the increased rates whence the refunds arose"; and (3) the commission's intent to hold a public hearing concerning "proper implementation" of the refund. The commission also made its presence felt on May 3 by issuing an order in which it said that the company "need not effect refunds pursuant to its filed tariff" and directed the company to place the proceeds in an interest-bearing account pending the commission's further order. The company failed to place the funds in an account and chose to use the money to finance its day-to-day operation. The company did, however, begin to assess on its books interest at 5 percent, which was to be included in the amount of the refund when it was eventually distributed to regular customers.

The commission's hearing into the refund disbursement began on June 25, 1976; the hearing was adjourned, and the commission met again on August 20 and December 16, 1976 and January 26, 1977 to consider additional evidence. No one really disputed the company's mathematics. The conflict centered on how to dispose of the $1,039,977. The company presented several employees who detailed the operation of the refund procedure. The division called to the witness stand an expert in economic counseling. He favored an alternative method of distributing the refund whereby

individual checks would be sent to every customer who had actually contributed to the excess payment. One of the contested issues presented at the hearings was the relative costs of the two plans. All parties agreed that the PGA costs were minimal, since the only expense involved was changing the per unit cost of gas purchased by the customer. The expert gave a cost estimate of $80,000 for the implementation of his pay-by-check plan, while if the company's estimate was accepted, the expert's plan could carry a $112,000 price tag. Also at issue was the commission's authority to stay and then modify the PGA.

It is recognized that regardless of the means employed in making a refund to customers. there is no perfect system of distribution. Some inequities will result. As indicated previously, under the PGA clause regular customers who paid the overcharges receive no compensation of they cease using gas as their energy source prior to the time when the unit price credit is figured into its rates. However, balanced against this is the fact that because of the PGA clause, these users were in all probability prior recipients of refunds for which they didn't contribute. Gas prices have continually been adjusted to refund overcharges since the 1960 adoption of the PGA. The automatic credit has been an ongoing process of which the consumer is usually not aware. A user during the period when Algonquin raised its prices and who paid for the increase may also have received a price credit for a prior overcharge. No evidence was presented at the hearings on this matter, but all parties agree that this would be a likely occurrence. An additional factor favoring utilization of the PGA credit plan is its minimum distribution cost..

The method proposed by the expert witness is not without its difficulties. First, because of the cost, there is less available for distribution to consumers. Secondly, if the company cannot locate regular users who are entitled to the refund, there is a question as to whether the money due

missing consumers can be used for the benefit of the other customers. Therefore, no system presented to the commission provides for a flawless means of dealing with refunds.

On May 31, 1977, the commission issued its report and order. It amended the PGA so that the company would be required to file refund information with the commission prior to making any distribution and the commission could then suspend or disapprove of any disbursement plan. With regard to the refund from Algonquin, the commission adopted the expert's plan and ordered the company to send individual checks to the customers who had paid the overcharges based upon their estimated usage over the period June 1974 to September 1975. The amount sent to customers was also to include interest accrued at a rate of 5 percent from April 12, 1976 through the date of the refund to the customers. Finally, the commission observed that since the company had failed to place the refund in an interest-bearing account as ordered, it should be required to treat the fund as customer contribution to capital. According to the commission, the approximate rate of return on invested capital for fiscal year 1976 was 9 percent. Thus, in addition to the 5 percent credited to the customer refunds, the commission ordered the company to accrue on its books interest of 4 percent on the refund from April 12, 1976. The company was to use the 4 percent to defray the cost of making the individualized refunds.

Having detailed at some length the regular customer credit procedure set forth in the PGA, its actual operation, and the 1977 cash refund plan promulgated by the commission, we now come to the legal issues presented by this controversy. At the outset, it is appropriate that we indicate to the parties what is the exact role of this court as it considers the pending petition.

During oral arguments, we were exhorted by the Attorney General to weigh the equities of the opposing refund programs and base our decision upon consideration of what

plan is most just for the consumer. In the opinion of the division, cash payments to those users who actually incurred the excessive gas costs would be the most equitable means of distribution. The company quite naturally expressed a different point of view about its PGA's credit provisions. This court cannot designate a preferred plan. In reviewing orders of the commission, we do not sit as a policy-making body. To do so would clearly be a usurpation of the authority granted to the commission by the Legislature in title 39 of the General Laws. The responsibility of weighing the competing interests in the formulation of policy in this area has been vested in the Public Utilities Commission.

Our task is relatively simple. Our sole prerogatives are to determine whether the commission's report and order are lawful and reasonable and whether its findings are fairly and substantially supported by legal evidence. *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. 271, 302 A.2d 757 (1973). In determining the legality of the commission's conduct, we must focus our attention upon the provisions of the tariff and the relevant statutes. These are the sources that delineate the parameters of the commission's power to regulate the company.

Turning first to the filed tariff, we find that there is nothing in its terms permitting the commission to stay implementation of the PGA refund procedure. The PGA provides that the unit refund "shall be applied to customer's [*sic*] bills commencing fifteen days after the date of refund unless otherwise extended by the Public Utilities Commission, and shall continue until the amount to be refunded has been consumed." This particular portion of the tariff speaks of an extension, not a stay, and unequivocally commands the company to commence the unit refund procedure within a set time with the possibility of some additional time being allowed to effect the refund if the company requires.

Since the tariff does not sanction the commission's is-

suance of a stay, the commission must rely on those powers, duties, responsibilities, and jurisdiction conferred upon it by the General Assembly. *Narragansett Elec. Co. v. Harsch,* 117 R.I. 395, 368 A.2d 1194 (1977); *Bristol County Water Co. v. Public Util. Comm'n.* 117 R.I. 89, 363 A.2d 444 (1076). Accordingly, we must examine the statutory scheme established by the Legislature in title 39 to determine whether the commission's action in staying the operation of the refund has a warrant in law.

The division directs our attention to a number of provisions which it claims, when viewed collectively, support the commission's action. We cannot agree with the division's position because an analysis of the individual statutes on which it relies reveals that the commission had no authority on May 3, 1976 to issue the stay.

Looking first to §39-3-11, the ratemaking provision, we have a statute with two separable parts. The first details the procedural steps which a public utility must take to have its filed tariff changed and how the commission shall act in such a case. In *Providence Gas Co. v. Public Util. Comm'n.* 116 R.I. 80, 352 A.2d 630 (1976), we examined at length how this portion of §39-3-11 operates, and no one questions the fact that when a utility is attempting to change its rate, the commission has the power to suspend the changes from taking effect. This court, however, has not previously been called upon to construe the latter segment of §39-3-11, which provides:

> "Notwithstanding the provisions of this section, the commission shall periodically hold a public hearing and make investigation as to the propriety of rates when charged by any public utility and shall make such order in reference to such rate, toll, or charge as may be just."

Standing alone, this particular portion of §39-3-11 establishes a means by which the commission may monitor tariff provisions by periodically holding public hearings on

utility rates. However, nothing in the statute grants the commission the authority to stay continued operation of an effective tariff pending the outcome of the commission's hearing. The clear import of the section is that the commission shall investigate and then, based upon evidence adduced at the hearing, make such order as may be just. Where the language of a statute is plain and unambiguous, there is no occasion for construction, and the statute must be given effect according to its plain and obvious meaning. *Pucci* v. *Algiere,* 106 R.I. 411, 261 A.2d 1 (1970).

Admittedly, there is one section of title 39 which specifically empowers the commission to take immediate action in specific limited circumstances; it is to be found in §39-1-32, which in its pertinent part reads:

> "Any general or public law notwithstanding, the commission, when it determines that public safety so requires, or that failure to act immediately will result in irreparable injury to the public interest * * * may issue an order effective immediately, but for temporary duration, until formal notice be given and a hearing had of the parties in interest."

While apparently supportive of the commission's actions, in *Providence Gas Co.* v. *Public Util. Comm'n,* 116 R.I. 225, 354 A.2d 413 (1976), we stressed that §39-1-32 is not to be used as an afterthought. Rather, §39-1-32 contains certain conditions which must be satisfied before it can be invoked. In this case, the commission's approach to altering the terms of the tariff does not come within the pale of §39-1-32.

The statute may be used when the "public safety so requires, or that failure to act immediately will result in irreparable injury to the public interest * * *." Obviously, the company's reliance on its PGA is in no way a threat to the public safety. Likewise, the commission does not maintain that the company's attempt to comply with the terms of the tariff would irreparably injure the public interest. The commission simply wished to reassess the PGA refund mechan-

ism to arrive at what it thought was a more equitable result. This does not constitute irreparable injury.

The division also argues that §39-3-13 provides the necessary statutory support for the commission's conduct. This section, entitled "Emergency suspension of rate schedules," provides:

> "The said division shall have power, when deemed by it necessary to prevent injury to the business or interest of the people or any public utility of this state in case of any emergency to be judged of by the said division, to permit any public utility to temporarily alter, amend or suspend any existing rates, schedules and order relating to or affecting any public utility or part of any public utility in this state."

Forgetting for the moment that §39-3-13 is addressed to the division's rather than the commission's discretion, this legislation contemplates that during "any emergency" the appropriate authority will "permit" a public utility to "temporarily" change its "existing rates."[3] The quoted words make it clear that §39-3-13 sanctions a *temporary change* in *rates* as a way of dealing with an *emergency*, and since the utility is *permitted* to make the change, it is obvious that the change comes about at the instigation of the utility. Here, the difference in opinion as to how to distribute the refund cannot be classified as an emergency, the change made by the commission in the company's rate structure is perma-

---

[3]The discretion to grant the temporary emergency relief to utilities which is identical to that described in §39-3-13 was originally given in 1912 to a three-member commission when the General Assembly enacted the Public Utilities Act, P.L. 1912, ch. 795, secs. 3 and 44. Later, in 1935, the General Assembly approved a governmental reorganization plan whereby the powers and duties of the commission were vested in a newly established Division of Public Utilities. Public Laws 1935, ch. 2188, sec. 1, and ch. 2250, sec. 72. Since that time the discretion to which we have referred has been exercised by the division. *Gardiner* v. *Kennelly*, 79 R.I. 367, 89 A.2d 184 (1952).

nent, not temporary, and there is no question that the company did not seek the change.

Since the statutes relative to the commission's power do not separably confer upon the commission the authority to suspend the PGA clause, we fail to see how, as the division argues, they empower the commission to do so when interpreted collectively. Even in the realm of simple mathematics, nothing plus nothing still equals nothing. While title 39 details a comprehensive plan of public utility regulation with primary responsibility of carrying out the plan being vested in the commission, there is also a clearly expressed legislative intent to restrict the commission's regulation so that in the absence of an emergency a utility can expect a certain degree of permanency in the type of control exercised over it by the commission. Thus, the Legislature prohibits the commission from interrupting the operation of an effective tariff by delineating specific circumstances when a stay may be issued. Therefore, we find that the report and order of the commission is null and void as it relates to the disposition of the April 12, 1976 refund. Not having the authority to stay implementation of the PGA, the commission could not prevent the company from distributing the refund within the 15 days set forth in the PGA clause of the tariff.

Our holding should not be interpreted as rendering the commission powerless to amend the terms of the PGA. In §39-3-11 the Legislature has established a procedure that enables the commission to make such a change. However, as noted earlier in this opinion, §39-3-11 clearly envisions that the tariff currently in force will continue in operation until a public hearing is held and after which an order will be entered.

In its May 31, 1977 order, the commission also amended the PGA clause to provide for a different refund procedure. This new clause provides that the company will calculate the amount of the refund and within 15 days submit "details

of the procedure to be followed in making refunds to customers." This stipulation places the manner of distributing refunds on an ad hoc basis. Apparently, it may be cash one time and credit another depending upon the commission's belief at the time the company submits its plan. While the amended PGA cannot be applied to the Algonquin refund, there is still a question of whether it may govern refunds received subsequent to the commission's May 31, 1977 order.

The source of the commission's authority to amend the terms of the tariff is §39-3-11, and its threshold requirement for lawful commission action is a "public hearing." However, there is no clue in §39-3-11 as to how the "public hearing" shall be commenced or conducted. The reason for this is, we believe, because the type of action contemplated by §39-3-11 falls squarely within the definition of a "contested case" set forth in the Administrative Procedures Act, G.L. 1956 (1969 Reenactment) §42-35-1(b).[4] By seeking to amend the PGA, the commission thereby engaged in the process of ratemaking and was obligated to comply with the provisions of ch. 35 of title 42.[5]

In §42-35-9, the Legislature establishes the necessary notice and hearing requirements to be followed in a "contested case." These procedural steps are quite specific and detailed so as to insure that parties have a fair opportunity to appear, present evidence, and have a decision rendered

---

[4]General Laws 1956 (1969 Reenactment) §42-35-1(b) provides: " 'contested case' means a proceeding, including but not restricted to ratemaking, price fixing, and licensing, in which the legal rights, duties, or privileges of a specific party are required by law to be determined by an agency after an opportunity for hearing."

[5]Although we find that the commission is subject to the Administrative Procedures Act in "contested cases," this does not mean that its actions are also subject to the judicial review provisions of the Act. General Laws 1956 (1969 Reenactment) §39-5-1 specifically exempts decisions or orders of the commission from the judicial review procedures set forth in ch. 35 of title 42. Instead, review is had by way of certiorari to this court.

on the evidence presented at the hearing. Of particular significance for our purposes are §42-35-9(a) and (b)(4), which state:

"(a) In any contested case, all parties shall be afforded an opportunity for hearing after reasonable notice.

"(b) The notice shall include:

\* \* \*

"(4) a short and plain statement of the matters inserted. If the agency or other party is unable to state the matters in detail at the time the notice is served, the initial notice may be limited to a statement of the issues involved and detailed statement shall be furnished."

These provisions make clear that a party[6] to a contested case shall receive notice which in plain terms draws attention to, among other things, the subject matter to be considered at the hearing.

The record of this petition contains a document entitled "Notice of Hearing," which presumably was used to inform parties of the hearing into the refund. It is unclear from the record precisely who was informed by the "notice" of the hearing. Surely, the company and the Consumers' Council were "parties" entitled to notice.[7] In addition, the company's regular customers were also "entitled as of right" to be "parties" and have an opportunity to be apprised about the hearing. All segments of the regular customer class could be affected by the manner in which the refund was to be distributed. Regardless of who was given notice,

---

[6]"Party" is defined in §42-35-1(e) as "each person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party."

[7]General Laws 1956 (1969 Reenactment) §39-1-17 confers upon the Consumers' Council the status of a party in "any inquiry \* \* \* or examination" into "tariffs, rates or charges." The council did not take part in the hearing on the refund. We cannot tell whether its absence was due to lack of notice, operating funds, or other reason.

we find that the notice, if given, was not adequate to inform the "parties" of what the commission would be considering at the hearing.

After stating the time and place of the hearing, the notice, in its pertinent portions, read as follows:

> "* * * the Public Utilities Commission will conduct a public hearing * * * on the filing made by the Providence Gas Company on April 12, 1976. The filing made on May 14, 1976 concerning the fee for restoration of service following a non-payment shutoff will be held at the conclusion of the rebate of the Algonquin refund hearing."

Besides being something less than a typographical masterpiece, the notice contains no information as to the amount of the refund, how the PGA clause would distribute it, or the possibility that the commission might amend the PGA. Under §42-35-9(b)(4), all "parties" had a right to be informed in clear and simple terms what the PGA clause provided and how the commission contemplated amending it. Without this information in the notice, it was really no notice at all, and the attempted amendment of the PGA amounts to a nullity.

The result we reach disposes of all but one of the issues raised by the parties. The unresolved issue is whether the company, in making the credit refund, should be required to include within its computations a figure representing interest due the regular customers from the date of the commission's May 3, 1976 order to the order of this court dated June 16, 1977.[8] Even though the PGA clause makes no reference to interest, the company has made it clear to us that although the delay was caused by the commission, it does

---

[8] In our order of June 16, 1977, staying the commission's May 31, 1977 order, we conditioned the stay upon the company's adding to the amount available for refund 8 percent interest per year from the date of our order.

not seek to profit as a consequence. To allow the company to distribute the refund without interest for that period between the commission's order and our stay would result in a windfall to the company. The company, by using the fund for financing its operation, saved the cost of short-term borrowing. The refund belongs to the company's customers, and it is obvious the company should make amends for the use of funds that actually belonged to eligible customers.

By G.L. 1956 (1969 Reenactment) §39-5-4, this court may, in reversing an order of the commission, make "such mandates, as law or equity shall require." Obviously, there is no set formula we can refer to in determining the proper rate of interest. Since the company concedes that its saving was the 6¼ percent interest it would have paid for short-term loans during the period and that this is more than the amount of interest which the commission ordered to be actually paid to customers,[9] we feel that the 6¼ percent is a fair charge. This amount will be included in the refund to be distributed to the company's customers according to the PGA clause.

The petition for certiorari is granted, the order of the commission is quashed, and the record is returned to the commission with our decision endorsed thereon.

*Hinckley, Allen, Salisbury & Parsons, Michael P. DeFanti, Robert J. Ferranty,* for petitioner.

*Julius C. Michaelson,* Attorney General, *R. Daniel Prentiss,* Special Assistant Attorney General, for respondent.

---

[9]Although the commission ordered the company to pay a total of 9 percent interest on the fund, it only required the company to allocate 5 percent as being due the customers with the remaining 4 percent to be used by the company to defray the cost of the distribution plan.