Frank J. FORMISANO et al.

v.

**BLUE CROSS OF RHODE ISLAND.**

No. 81–459–Appeal.

Supreme Court of Rhode Island.

May 31, 1984.

Mark A. Sjoberg, Lovett & Morgera, Ltd., Providence, for plaintiff.

Edwin H. Hastings, Tillinghast, Collins & Graham, Providence, for defendant; Elia Germani, Providence, of counsel.

## OPINION

SHEA, Justice.

This case comes before us on appeal by the plaintiff, Frank J. Formisano, as president of Local Union No. 220, United Rubber, Cork, Linoleum and Plastic Workers of America (Local 220, URW), from a judgment of the Superior Court in a declaratory-judgment action. The case was presented to the court on an agreed statement of facts. The issue before the court is the plaintiffs' entitlement to reimbursement of two months' premiums paid as a condition precedent to their obtaining extended health-care coverage following the termination of their employment. We affirm the judgment entered.

On January 30, 1981, P.F. Industries shut down its operations. The parties stipulated that for some time prior to the company's closing, certain contracts were in effect between Blue Cross and Blue Shield of Rhode Island and the employees of P.F. Industries providing health-care coverage at group rates. Premiums were paid in full by the employer as agent of its employees, pursuant to its collective-bargaining agreement with Local 220, URW. The Blue Cross-Blue Shield contracts pro-vided for automatic termination of coverage following default in payment of premiums after a thirty-day grace period. A series of defaults occurred in the latter part of 1980. Claims that arose during the grace period were honored. Claims that arose after the grace period were "frozen." After extensive negotiations failed, coverage was discontinued effective December 1, 1980. In February 1981 Blue Cross forwarded conversion notices to the employees, offering them the opportunity to continue their health-care coverage at the previous group rate for up to ten months, provided they paid their proportionate share of the defaulted premiums for the months of December 1980 and January 1981. Approximately one-half of the employees so notified availed themselves of the offer.

On April 23, 1981, Formisano sought declaratory relief in Superior Court, alleging that he and all other former employees of P.F. Industries, Inc., similarly situated, were entitled to a special conversion opportunity for extended coverage as provided in G.L. 1956 (1979 Reenactment) § 27-19.1-1. He further alleged that Insurance Regulation No. 23 issued by the Department of Business Regulation had the effect of automatically amending the existing contract in regard to the minimum standards applicable to notices of discontinuance. He asserted that the procedure adopted by Blue Cross in this instance did not comply with such standards.

In his decision, the trial justice found that § 27-19.1-1 did not apply to employees permanently terminated because of the closing of a business. He also held that Insurance Regulation 23 did not automatically amend the already existing contract between the parties. A judgment was entered denying the relief sought. The plaintiffs appealed.

The plaintiffs take the position that § 27-19.1-1 is controlling in situations in which employees are out of work through no fault of their own and are unprotected

against the cost of illness or disability. By its terms, § 27–19.1–1 provides that

"(a) Whenever the employment of an insured member of a group hospital, surgical, or medical insurance plan is terminated because of *involuntary lay-off* or death, the benefits of such plan may be continued, as provided herein for a period of up to ten (10) months from the termination date of the insured member, but in any event not to exceed the shorter of the period which represents the period of continuous employment preceding termination with the employer under whose contract the member is insured * * *." (Emphasis added.)

Specifically, plaintiffs claim that they were "involuntarily laid off" within the meaning of § 27–19.1–1. They argue that Blue Cross-Blue Shield's action in making extended coverage contingent on payment of defaulted premiums attributable to the employer was inconsistent with the meaning and spirit of the statute. We disagree.

We have said time and again that "[w]here the language of a statute is plain and unambiguous, there is no occasion for construction, and the statute must be given effect according to its plain and obvious meaning." *Providence Gas Co. v. Burke*, 119 R.I. 487, 499, 380 A.2d 1334, 1340 (1977). "In construing a statute, the court must give the words their plain and ordinary meaning. * * * If the language of the statute is clear and unambiguous and conveys a definite and sensible meaning that does not contradict an evident legislative purpose, the court must apply the words literally." *Rathbun v. Leesona Corp.*, R.I. 460 A.2d 931, 933 (1983).

At issue here is the meaning of the term "involuntary lay-off" as used in § 27–19.1–1. The plaintiffs acknowledge that the customary layoff involves an employer who terminates for lack of work an employee who is subject to recall when the workload increases. They contend, however, that permanent termination is not excluded from the definition of the term. The defendant, in response, argues that the legislative objective behind § 27–19.1–1 contemplated a continuing "group plan," not one that had terminated prior to the closing of business because of nonpayment of premiums.

No prior Rhode Island cases have defined the term "lay off." Webster's Third New International Dictionary at 1281 (1971) defines the verb "lay off" thus: "to cease to employ [a worker] usu[ally] temporarily because of slack in production * *."

Other jurisdictions have held that the term "lay off" generally means "temporary cessation of employment with an expectation of eventual return." *Conner v. Phoenix Steel Corp.*, 249 A.2d 866, 869 (Del.1969). In determining the eligibility of an employee under a company pension plan, the Louisiana Court of Appeals found that this term "has been generally interpreted by the courts to mean a suspension of employment and not a termination of employment." *White v. Crane Co.*, 147 So.2d 32, 36 (La.Ct.App.1962). "Layoff" ordinarily means "a 'period of temporary dismissal'" with anticipation of recall. *CBS Inc. v. International Photographers of the Motion Picture Industries, Local 644, I.A.T.S.E.*, 603 F.2d 1061, 1063 (2d Cir.1979). Within provisions of the Michigan Employment Security Act governing back-to-work benefits, "[a] 'layoff' is a temporary dismissal by the employer which anticipates reemployment and therefore is distinguished from unemployment by reason of discharge, resignation or other *permanent termination.*" (Emphasis added.) *General Motors Corp. v. Erves*, 399 Mich. 241, 253, 249 N.W.2d 41, 46 (1976). *See* 24A Words and Phrases at 23 and the many cases cited therein.

■ We conclude that the term "lay off" as used in § 27–19.1–1 does not include employees permanently terminated from employment by reason of an employer's going out of business. To hold otherwise would require reading into our statute something that the Legislature, in our opinion, had not intended. Consequently, we

hold that § 27–19.1–1 does not apply to these plaintiffs.

Moreover, we agree with the trial justice that the rights of the parties in this case are discernible from the language of the existing contract between the parties. The terms of the contract control the period and conditions of coverage. Part V(D) provides in part:

"If a Group membership, this agreement shall continue in force until a default shall exist for 30 days in the payment of subscription charges, or until the effective date, during such period of default, of any new agreement the applicant may enter into with the Corporation, in either of which cases this agreement shall automatically terminate. In either case the applicant will remain liable for payment of subscription charges to such date of termination."

■ "Applicant" is defined as "any individual with whom the Corporation has entered into a subscription agreement." As stipulated by the parties, subscription fees for coverage were paid by the company as the agent of its employees pursuant to its obligation under its collective-bargaining agreement with Local 220, URW. "Applicant's Agent" is defined in the contract as "any individual who * * * pays for the applicant, in whole or in part, or which as agent for the applicant has agreed to collect and remit, in whole or in part, subscription charges payable under this agreement * * *." It is generally held that discontinuance by the employer of payment of premiums for an employee insured under a noncontributory group policy terminates his coverage under the policy. *Massachusetts Mutual Life Insurance Co. v. De Salvo*, 174 Colo. 115, 124, 482 P.2d 380, 384–85 (1971); *Tedesco v. Turner & Seymour Manufacturing Co.*, 19 Conn.Supp. 192, 110 A.2d 650 (1954). It would logically follow then that the employees would be responsible for any premiums due after the default began, in this case, after December 1, 1980.

The plaintiffs further argue that Insurance Regulation 23 issued by the director of business regulation has the effect of automatically amending the existing contract between the parties with respect to the requirements for notice of discontinuance. The plaintiffs rely principally on part IX, section 3, of the regulation which requires notification to employees covered under a contract subject to automatic discontinuance for nonpayment of premiums. Notice is to be given either through the group master contract-holder (the employer) or by direct mail to the employees of the effective date of discontinuance. The contract in existence at the time this dispute arose did not require notice to the employees of any discontinuance of coverage.

Insurance Regulation 23 was promulgated pursuant to G.L.1956 (1977 Reenactment) § 42–62–12. That section authorizes the making of regulations for health-service contracts. The purpose of the regulations is to establish minimum standards to which all health-benefit plans issued, delivered, or offered for sale in Rhode Island must comply. Pursuant to § 42–62–12, the director of the Department of Business Regulation has the authority to promulgate rules and regulations establishing the minimum standards with which insurers must comply in order for their plans to qualify. Subsection (c) of § 42–62–12 provides that after promulgation of the regulations, samples of proposed contracts shall be filed with the director for a hearing or other review. The director shall take affirmative action within a reasonable time to approve, disapprove or modify the proposed form. The statutory standards governing the director's approval seek to ensure mainly the public's protection against misleading or deceptive practices.

■ The Legislature has the constitutional authority to prescribe conditions under which an insurance company shall transact business within our state, and concomitantly it has the power to delegate to the director of business regulation the au-

thority to issue rules and regulations governing the content of insurance contracts. Once filed, such regulations have the force of statute. *Fidelity & Casualty Co. of New York v. Darrow*, 161 Conn. 169, 286 A.2d 288 (1971). This authority includes the establishing of procedures whereby insurance policies and provisions must be approved by the director before they can be lawfully issued by an insurance company.

 We do not agree with plaintiffs' contention that once enacted, these rules or regulations automatically amend preexisting contracts. Rather, absent specific language to the contrary, the regulations have prospective application only. 19 Appleman, *Insurance Law and Practice* § 10453 at 367–68 (1982). What we have said with respect to statutes is equally applicable to regulations, that is, a "statute is presumed to have been intended to operate prospectively and will not be construed to operate retroactively unless such an intent appears in the express language of the statute or by necessary implication therefrom." *Norton v. Paolino*, 113 R.I. 728, 734, 327 A.2d 275, 279 (1974). Regulation 23 reads, "This Regulation is effective October 9, 1978. Forms to bring contracts into compliance must be submitted by July 6, 1979. All forms of contracts issued or delivered in Rhode Island must be in compliance on and after October 4, 1979." Subsection (c) of § 42–62–12 expressly provides that after promulgation of regulations by the director, samples of contracts must be filed with the director for hearing or other review. Thereafter, the director *shall* "approve, modify, or disapprove" the offered contract. At the time of the events that gave rise to this controversy, Blue Cross-Blue Shield, it is argued, had submitted samples and was engaged in extended discussions with the director regarding contracts and contract revisions. Contracts had been submitted to the director prior to the events in question. No action had been taken by the director at that time. It follows, therefore, that in the absence of the approval of the newly submitted contract,

the old contracts, of necessity, continued in force. We hold, therefore, that the trial justice was correct when he found that Insurance Regulation 23 did not have the effect of automatically changing the nature of the contract already in existence between the parties.

Finally, we note that the agreed statement of facts stipulated that the contract at issue was between Blue Cross-Blue Shield and the employees of P.F. Industries pursuant to a collective-bargaining agreement. We therefore reject the plaintiffs' remaining argument based on the theory of third-party beneficiary as having no foundation in the facts of this case.

For the reasons stated, the plaintiffs' appeal is denied and dismissed, the judgment of the Superior Court is affirmed, and the papers in the case are remanded to the Superior Court.

WEISBERGER and MURRAY, JJ., did not participate.