**BLACKSTONE VALLEY
ELECTRIC CO.**

v.

**PUBLIC UTILITIES COMMISSION.**

No. 87–174–M.P.

Supreme Court of Rhode Island.

May 31, 1988.

Peter J. McGinn, Tillinghast, Collins & Graham, Providence, for plaintiff.

James E. O'Neil, Atty. Gen., Sheldon Whitehouse, Asst. Atty. Gen., Providence, for defendant.

## OPINION

KELLEHER, Justice.

This is a statutory petition for certiorari brought by the Blackstone Valley Electric Company (Blackstone) pursuant to G.L. 1956 (1984 Reenactment) § 39–5–1. Blackstone seeks review and reversal of an order issued by the Public Utilities Commission (commission). The challenged order denied Blackstone's request to surcharge its customers for an increase in the cost of its purchased electricity.

The increase at issue was created by a cost of fuel adjustment that was billed to Blackstone by its wholesale supplier of electricity after the wholesaler, Montaup Electric Company (Montaup), discovered

that it had used more coal to produce power than was recorded on its books. Blackstone argues that this coal consumption adjustment is recoverable from its retail customers under the terms of the price adjustment clause of its federally approved tariff. The Division of Public Utilities and Carriers (division) opposes this cost pass-through to consumers because, it contends, Blackstone and Montaup exceeded the tariff's filing deadline by seeking reimbursement well after the authorized five-month adjustment period had expired.

The division also urges us to affirm the actions of the commission regarding the requested cost pass-through. The commission's denial of Blackstone's request was based on its belief that any approval of the proposed adjustment would constitute prohibited retroactive ratemaking. We disagree.

Before discussing retroactive ratemaking and the pertinent provisions of Blackstone's tariff, we shall review the factual background of this dispute. Both Blackstone and Montaup are controlled by the same corporation, Eastern Utilities Associates (EUA), which is Blackstone's parent corporation and the owner of all of Montaup's common stock. Blackstone purchases its electric power wholesale from Montaup at terms approved by the Federal Energy Regulatory Commission.

During the period beginning January 1, 1985, and extending through January 31, 1986, Montaup burned fuel from its inventory of coal located at its plant in Somerset, Massachusetts. When this coal was first delivered to Montaup, it was tested and determined to have an average moisture content of 4 percent. The coal, however, was stored outdoors where it was exposed to the vagaries of the New England climate. Tests conducted on the weathered stockpile in November 1985 and January 1986 indicated that the moisture content of Montaup's coal had increased to an average of 7.8 percent. Coal with a higher moisture content, according to Blackstone's expert witness, burns less efficiently than the same quantity of drier coal. Consequently, more coal was used to produce power than was recorded in Montaup's accounting records.

In April 1986 Montaup adjusted its books to reflect the amount of coal actually burned during the period January 1, 1985, through January 31, 1986, and in June 1986 it assessed Blackstone $354,722.49 as its share of the fuel cost increase. In October 1986 Blackstone sought approval from the commission to pass along this fuel cost to its retail customers. The commission twice deferred consideration of this matter. Eventually, in late February 1987, a public hearing was held to review Blackstone's application.

During the hearing Blackstone presented three witnesses who were questioned by counsel for the division and by members of the commission. The first witness, EUA's senior rate analyst, explained the reasons for Montaup's coal adjustment. The next witness for Blackstone, an EUA manager, testified about the operation of Blackstone's fuel adjustment clause. Finally, an outside expert for the utility was questioned on the subject of fuel prices in New England.

Two months after the hearing, the commission issued its written order and emphasized that "[t]he Commission is not ruling on the propriety of a coal consumption adjustment, but rather on its chronological applicability."

Notwithstanding our limited power of review over commission rulings, *In re Woonsocket Water Department,* 538 A.2d 1011 (R.I. 1988), we are compelled to quash the denial because it fails to give legal effect to the fuel provision in Blackstone's tariff. *Providence Gas Co. v. Burke,* 119 R.I. 487, 380 A.2d 1334 (1977).

Blackstone's filed tariff, R.I.P.U.C. No. 728, contains a fuel adjustment clause that went into effect on November 1, 1985. Like the fuel adjustment clause it replaced, R.I.P.U.C. No. 567, the November 1985 clause was designed in part to mitigate the financial risks to the utility created by volatility in the cost of its purchased fuel. We had occasion to describe such a provision in *Providence Gas Co. v. Burke.*

"Such a clause usually provides for the fluctuation upward or downward of the rate charged to the consumer, reflecting, in accordance with a formula * * * changes in the cost of the fuel it uses to generate power. As the utility's costs rise or fall, a corresponding increase or decrease in the prices charged to the consumer must occur. This is the reality of the marketplace. Otherwise, a utility runs the risk of becoming insolvent, or it may reap windfall profits. In a period of rapid increases in costs to the utility, solvency is a paramount consideration. At another time the situation may be reversed, and every effort must be made to avoid the windfall.

"The device which has been fashioned to take care of either eventuality has been variously labeled as an 'automatic adjustment clause,' or 'escalator clause' * * * or a 'pass-through procedure.' However the clause is entitled, it becomes part of the utility's rate structure and serves to lessen the burden and expense to the utility, which would ultimately fall upon the consumer, of instituting and carrying out separate rate proceedings to justify the varying charges." 119 R.I. at 490–91, 380 A.2d at 1336.

Blackstone's adjustment clause calls for tri-annual estimates of its wholesale fuel costs. The clause also provides for the reconciliation of such costs for the previous five months by adjusting current fuel cost estimates. The pertinent section of the fuel adjustment clause reads as follows:

"In determining the estimated average fuel cost for any period, any differentials for the preceding five months between actual fuel costs incurred and attributable to consumption under rates subject to this clause and costs recovered under the clause shall be added to or subtracted from the subsequent estimate of fuel costs."

■ The clause goes on to address two contingencies,[1] but it does not specifically authorize recovery of costs incurred prior to the five-month reconciliation period. The division argues that the absence of such language is fatal to Blackstone's appeal. More than seven months elapsed between the time Blackstone was assessed and the date of the hearing. Further, more than one year passed from the time Montaup discovered its coal deficiency to the date of the commission hearing on the matter. This chronology, according to both the commission and the division, removed Blackstone's requested cost recovery from the ambit of its fuel adjustment clause. We respectfully disagree.

Blackstone cannot be faulted for the postponement of its commission hearing to February 1987. As noted earlier, less than five months passed between Blackstone's receipt of the June 1986 coal assessment and the filing of its October 1986 request for a fuel cost adjustment. It was the commission, and not Blackstone, that delayed the hearing for four months and the decision for an additional two months. There is simply no support in the record for the contention that Blackstone violated the fuel adjustment terms of its tariff.

Even less significant in the chronology of this controversy are Montaup's delays in detecting the coal deficiency and in adjusting its books and billings. The critical factor here is Blackstone's "current estimated cost of fuel," not that of Montaup, the wholesale supplier. This important distinction is spelled out in Blackstone's tariff, which provides that the fuel adjustment clause "will apply to reflect fluctuations in the cost of fuel *charged* by the Company's wholesale suppliers of power." (Emphasis added.)

■ There is no question that Montaup charged Blackstone for the coal adjustment in its June 1986 fuel bill. At that point, Montaup's coal adjustment became part of Blackstone's current cost of fuel. We shall not review the propriety of the coal adjust-

1. If actual costs and revenues are not available for any month within a tri-annual accounting period, they shall be estimated for the purpose of calculating the fuel adjustment. In addition, in the event that the utility encounters extraordinarily volatile fuel costs between accounting periods, it is directed to seek interim adjustments from the commission.

ment because the commission, in its role as the finder of fact, explicitly declined to rule on this question. *South County Gas Co. v. Burke*, 486 A.2d 606, 608 (R.I. 1985). We therefore accept the coal assessment as a legitimate increase in Blackstone's whole-sale fuel costs.

 We now turn to the division's argument that the commission correctly characterized the coal adjustment as a violation of the rule against retroactive ratemaking. This rule "protects the public by ensuring that present customers do not pay for past revenue losses in their current payments. It also prevents the company from employing future rates as a means of ensuring its stockholders' investments." *In re Woonsocket Water Department*, 538 A.2d at 1014. This general proscription against retroactive ratemaking gives way, however, to the exercise of the so-called emergency exception to the rule. *Providence Gas Co. v. Burke*, 475 A.2d 193 (R.I. 1984); *Narragansett Electric Co. v. Burke*, 415 A.2d 177 (R.I. 1980).

This exception allows utilities to use their pass-through procedures to recover unforeseeable and extraordinary expenses as long as the rate allowance does not contravene the policies underlying the rule against retroaction. In the 1980 *Narragansett* decision we applied the exception to a one-time surcharge created by a devastating ice storm, and in the 1984 *Providence Gas* opinion we ruled that an unanticipated supplemental tax surcharge was recoverable.

 Here the coal consumption adjustment clearly falls within the established parameters for this exception. Blackstone could not have foreseen a decrease in the energy value of Montaup's coal pile in Somerset. For almost one year even the managers at Montaup and the auditors at EUA were unaware of the moisture-content problem. In short, the situation that led to the surcharge was an extraordinary event that is unlikely to recur. Additionally, there is no evidence that the coal adjustment was proposed for any reason other than fuel cost recovery, a purpose endorsed in Blackstone's tariff and accepted by this court.

Our role in this dispute is to determine whether the commission's ruling is lawful and reasonable and whether its findings are fairly and substantially supported by legal evidence. *Rhode Island Consumers' Council v. Smith*, 111 R.I. 271, 302 A.2d 757 (1973). After reviewing the record and the arguments presented, we conclude that the commission committed an error of law in failing to distinguish this controversy from cases that involve prohibited retroactive ratemaking. The commission also erred by not allowing a fuel assessment pass-through in accordance with the provisions of Blackstone's tariff. For these reasons, the commission's order cannot prevail.

The petition for writ of certiorari is granted, the order of the commission is quashed, and the record is returned to the commission with our decision endorsed thereon.