DECISION
This case is before the Court on appeal from a Final Decision and Order issued by the Department of Environmental Management (DEM) finding Anthony Giarrusso (appellant) liable for an assessment of an administrative penalty in the amount of twenty-four thousand seven hundred and fifty ($24,750) dollars. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 FACTS/TRAVEL
The appellant Anthony Giarrusso is the owner of a parcel of real property located at 3729 Tower Hill Road, South Kingstown, Rhode Island (the Facility).[1] In 1986, the appellant registered the Facility with DEM pursuant to section 8 of the Regulations for Underground Storage Facilities Used for Petroleum Products and Hazardous Materials (UST Regulations). In his registration application, the appellant indicated that three underground storage units, one containing waste oil and two containing gasoline, were located on the property. Around 1991, the appellant ceased utilizing the underground storage units.
On December 6, 1993, DEM issued a Notice of Violation and Order (NOV) to the appellant alleging that he had failed to perform certain required leak detection tests on his underground storage units (precision testing) for the years of 1986, 1987, 1988, and 1989. The NOV further alleged that the appellant had illegally removed from service and/or abandoned the underground storage units for the three years prior to the issuance of the NOV. The NOV informed the appellant that he had thirty days in which to submit copies of all precision test results and to close all underground storage units at the Facility. The appellant was also assessed an administrative penalty in the amount of twenty-four thousand seven hundred and fifty ($24,750) dollars. On or about December 30, 1993, the appellant responded to the NOV and requested a hearing pursuant to G.L. 1956 §§ 42-17.1-2 (u), 42-17.6.4 and 42-35.
On April 26, 1995, the appellant filed a Permanent Closure Application for Underground Storage Facilities (the closure application) seeking permission to remove the two underground storage units which contained gasoline from the facility. The two units, along with the waste oil tank and a volume of contaminated soil, were removed between May 25, 1995, and June 1, 1995.
The administrative hearing was conducted by DEM Hearing Officer Joseph Baffoni (hearing officer) on October 23 and 24, 1995. At the hearing, testimony was elicited that gasoline was last sold at the facility in 1990 or 1991, that no gasoline was stored in the tanks after 1991, and that the appellant never filed a petition seeking to extend the temporary closure period beyond 180 days. Transcript of October 24, 1995, pgs. 34, 36, 38. On May 16, 1997, the hearing officer issued his recommended decision and order for the Director's review. In his decision, the hearing officer noted that although the penalty that was assessed in the NOV was based upon the three years prior to the NOV, the appellant's failure to address and correct the abandonment violations after the issuance of the NOV was a continuing violation which subjected the appellant to additional penalties for said period. Id. at 15. The hearing officer further concluded that the subject USTs were illegally closed and abandoned from May 25, 1992 (the date that the legal temporary closure period of 180 days expired) to May 25, 1995 (the date that appellant's tank removal operation began at the facility), for a total period of three years. As such, the hearing officer found that the net duration of the abandonment was the same as proposed in the NOV and, consequently, held that the penalty for the abandonment violations should remain the same as specified in the NOV. The hearing officer also concluded that the separate penalty for the economic advantage the appellant gained by not performing the precision testing was properly imposed since the NOV was issued after the effective date of the 1992 Rules and Regulations for the Assessment of Administrative Penalties (Penalty Regulations) and since the fine imposed was less than the minimum fine permitted under the 1987 Penalty Regulations. Therefore, the hearing officer ordered that the NOV be sustained and the appellant be assessed a penalty in the amount of twenty-four thousand seven hundred and fifty ($24,750) dollars.
On July 15, 1997, the Director of DEM adopted the decision and order as DEM's final agency order. On August 7, 1997, the appellant filed an appeal of the Final Decision and Order of DEM.
In his appeal, the appellant first contends that DEM failed to comply with its own rules and regulations. Specifically, the appellant alleges that DEM failed to introduce credible testimony that, under the 1985 UST regulations, the underground storage units had been abandoned for three years prior to the issuance of the NOV. Secondly, the appellant argues that the monetary penalties assessed by DEM were not properly calculated. Specifically, the appellant argues that DEM was prohibited under the 1987 Penalty Regulations from imposing a separate penalty for the alleged "economic advantage" that the appellant gained and that the penalties are improper since they were determined by a committee rather than the Director, as required by G.L. 1956 § 42-17.6-2. Furthermore, the appellant contends that DEM failed to explain how they determined the type of violation or to prove by a preponderance of the evidence the Director considered the factors enumerated in G.L. 1956 § 42-17.6-6, entitled "Determination of Administrative Penalty."
 STANDARD OF REVIEW
The review of a decision of the Department of Environmental Management by this Court is controlled by G.L. 1956 § 42-35-15
(g) which provides for review of a contested agency decision:
 "(g) The Court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The Court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion."
This section precludes a reviewing court from substituting its judgment for that of an agency in regard to the credibility of witnesses or the weight of the evidence concerning questions of fact. Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). Therefore, this Court "must uphold the agency's conclusions when they are supported by any legally competent evidence in the record." Rocha v. State PublicUtilities Comm., 694 A.2d 722, 725 (R.I. 1997) (citing RhodeIsland Public Telecommunications Authority v. Rhode Island LaborRelations Board, 650 A.2d 479, 485 (R.I. 1994)). This is true even in cases where the Court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Berberian v. Dept. of EmploymentSecurity, 414 A.2d 480, 482 (R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record."Milardo v. Coastal Resources Management Council, 434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody, 509 A.2d at 458. The Superior Court is required to uphold the agency's findings and conclusions if they are supported by competent evidence. Rhode Island Public Telecommunications Authority, etal. v. Rhode Island Labor Relations Board. et al., 650 A.2d 479, 485 (R.I. 1994).
 ADDITIONAL PENALTIES FOR CONTINUAL VIOLATIONS
The hearing officer concluded that an administrative penalty could be imposed for continual violations rather than the three year period referred to in the NOV. Pursuant to G.L. 1956 §42-17.6-3, the hearing officer is empowered to impose an administrative penalty for continual violations which occurred due to the appellant's failure to take reasonable efforts to comply with the NOV.
The NOV issued by the director on December 6, 1993, stated that "observation of [the] facility by DEM staff members and the facility's lack of compliance with the UST Regulations for the past three years indicate that the tanks located thereon have been abandoned." Paragraph F(3) of the NOV informed the appellant that pursuant to G.L. 1956 § 42-17.6-3, "if reasonable efforts [were] not made to promptly comply with [the] NOV, each day shall be considered a separate offense and shall be subject to a separate administrative penalty." The testimony that the appellant did not file a petition seeking to extend the temporary closure period beyond 180 days until April 1995, more than a year after the NOV was issued, clearly establishes that the appellant did not take reasonable steps to bring his facility into compliance with UST regulations. Therefore, the hearing officer's concluding that, although the penalty that was assessed in the NOV was based upon the three years prior to the NOV, the appellant's failure to address and correct the abandonment violations after the issuance of the NOV was a continuing violation, pursuant to G.L. 1956 § 42-17.6-3, which subjected the appellant to additional penalties for said period, was supported by competent evidence of record and did not constitute an error of law. Decision at 15.
 THE ABANDONMENT ISSUE
The hearing officer also concluded that the subject USTs were illegally closed and abandoned from May 25, 1992, (the date that the legal temporary closure period of 180 days expired) to May 25, 1995 (the date that appellant's tank removal operation began at the facility). The appellant argues that DEM failed to prove by a preponderance of the evidence that an abandonment had occurred in regards to his USTs. The appellant argues that although the NOV stated that the tanks had been abandoned for the three years prior to the issuance of the NOV, DEM offered no credible testimony that the tanks had been abandoned. The appellant contends that the definition of abandonment set forth in the 1985 UST Regulations, and not the 1992 Regulations, controls and as such, DEM failed to prove the "relinquishment or termination of possession, ownership, or control of the underground storage tanks." According to the appellant, DEM admitted that it had no knowledge that the tanks had been abandoned or if appellant had vacated, sold, or relinquished control of the premises in question. Therefore, the appellant contends that the evidence produced at the hearing demonstrates that the appellant did not relinquish possession, ownership, or control of the premises until he petitioned to remove the tanks in 1995.
The DEM avers that in order to prove that the appellant had abandoned the underground storage tanks, they did not have to show that the appellant vacated, sold or relinquished control of the premises. Rather, DEM maintains that it just had to prove that the appellant's underground storage tanks had been out-of-service for more than 180 consecutive days without having received an extension of the temporary closure period from the Director in violation of §§ 15.04 and 15.05 of the 1992 UST Regulations. The DEM argues that there was credible testimony that the tanks were abandoned, namely the admission by the appellant that gasoline was last sold at the Facility in 1990 or 1991, that no gasoline was stored in the tanks after 1991, and that he never asked to extend the temporary closure period beyond the 180 days. As such, DEM contends that the Director concluded as a matter of law that the appellant's underground storage tanks were unlawfully out of service and/or abandoned in violation of § 15.02 (a).
The DEM further argues that even though the definition of abandonment had changed under the 1992 UST Regulations, the appellant was clearly still in violation of the permanent closure requirements of § 15 (d) and § 15 (e) of the 1985 UST Regulations. The DEM contends that had the NOV been issued prior to the promulgation of the 1992 UST Regulations, DEM would have simply cited appellant for violating § 15 (d) and § 15 (e). According to DEM there does not exist any substantive distinction between the requirements of the 1985 UST Regulations and the 1992 UST Regulations as applied to USTs removed from service for more than 180 consecutive days and, as such, no substantial rights of the appellant have been prejudiced.
It is well established that statutes and their amendment are presumed to apply prospectively. Lawrence v. Anheuser-Busch,Inc., 523 A.2d 864, 869 (R.I. 1987). Only where it "`appears by clear, strong language or by necessary implication that the Legislature intended' a statute to have a retroactive application will the courts apply it retroactively." Hydro-Manufacturing,Inc. v. Kayser-Roth Corp., 640 A.2d 950, 954 (R.I. 1994) (citingVanMarter v. Royal Indemnity Co., 556 A.2d 41, 44 (R.I. 1989)). Our Supreme Court has held that the sentiment that "a statute is presumed to have been intended to operate prospectively and will not be construed to operate retroactively unless such an intent appears in the express language of the statute or by necessary implication therefrom" applies equally to regulations. Formisanov. Blue Cross of Rhode Island, 478 A.2d 167, 171 (R.I. 1984). Therefore, absent any evidence to support retroactive application of the 1992 definition of abandonment, the 1992 UST Regulations must be applied prospectively.
The 1992 UST Regulations submitted to this Court state that they became effective July 21, 1992. This Court finds no indication, either by express language or by implication, that the 1992 UST regulations were to apply retroactively to violations which occurred prior to their effective date. The Final Decision and Order of DEM found that the appellant had abandoned his underground storage tanks for a three year period beginning in May 1992 and ending in May 1995. Since the initial violation transpired prior to the effective date of the 1992 UST Regulations, this Court must review the findings of abandonment pursuant to both the 1985 UST Regulations and the 1992 Regulations.
 A. The May 1992 Violation
After a review of the record, this Court finds that the Hearing Officer's conclusion that an abandonment violation occurred from May 1992 until May 1993 was not supported by a preponderance of the evidence. Although this Court is differential to an agency's interpretation of its regulations, the "measure of the deference due depends on the persuasive power of the interpretation, given the totality of the attendant circumstances." Citizens Sav. Bank v. Bell, 605 F. Supp. 1033
(1985) (citations omitted). Section 6 of the 1985 UST Regulations defines abandonment as the "relinquishment or termination of possession, ownership or control of underground storage tanks, by vacating or by disposition, without meeting the closure requirements listed in section 15 of [the] regulations." Here there was no evidence presented by DEM that established that the appellant had either relinquished or terminated his possession, control or ownership of the facility. Rather, the appellant testified at the administrative hearing that he continued to do business at the facility and that he did not relinquish ownership until the tanks were removed in 1995. Since DEM failed to meet its burden, this Court finds the hearing officer's concluding that an abandonment under § 6 of the 1985 UST Regulations occurred for the period of May 1992 until May 1993 was affected by error of law and was not supported by the reliable and probative evidence of record.
Additionally, this Court finds DEM's argument, that even though the definition of abandonment had changed under the 1992 UST Regulations, the appellant was clearly still in violation of the permanent closure requirements of § 15 (d) and § 15 (e) of the 1985 UST Regulations, to lack merit. The NOV issued to the appellant stated that he was in violation of § 15.02 prohibiting the abandonment of any UST or UST system. Nowhere in the NOV did it state that the Director had reasonable grounds to believe that the appellant had violated § 15 (d) and § 15 (e) of the 1985 UST Regulations. The fact that there may not exist any substantive distinction between the requirements of the 1985 UST Regulations and the 1992 UST Regulations as applied to USTs removed from service for more than 180 consecutive days is irrelevant given the requirements of G.L. 1956 (1988 Reenactment) § 42-17.6-3. According to § 42-17.6-3, written notice of DEM's intent to assess an administrative penalty must be given and shall include each law, rule, regulation, order, permit, license or approval which has not been complied with. Since no reference was made to § 15 (d) or § 15 (e) in the NOV, the appellant could not have been found to have violated either § 15 (d) or § 15 (e) of the 1985 UST Regulations.
 B. The May 1993 and May 1994 Violations
After a review of the record, this Court finds that DEM's finding that the UST at the Facility had been abandoned from May 1993 until May 1995 is supported by the evidence of record and is clearly not erroneous. Section 7.01 of both the 1992 and 1993 UST Regulations define abandonment to mean "the relinquishment or termination of possession, ownership or control of underground storage tanks, by vacating or by disposition, without meeting the closure requirements listed in Section 15.00 of these regulations; or the action of taking a UST or UST system out of operation for a period of greater than 180 consecutive days without the prior permission of the Director pursuant to Section 15.00." Ms. Susan Cabeceiras, DEM's witness, testified that DEM based the abandonment alleged in the NOV on the observations of its employees and the lack of precision testing for the tanks located on the Facility. Furthermore, the appellant's permanent closure application and his testimony at the hearing established that gasoline was last sold at the facility in 1990 or 1991, that no gasoline was stored in the tanks after 1991, and that he never filed a petition seeking to extend the temporary closure period beyond 180 days. As such, DEM satisfied its burden of establishing that the appellant's underground storage tanks had been out-of-service for more than 180 consecutive days without having received an extension of the temporary closure period from the Director in violation of §§ 15.04 and 15.05.
Additionally, there was no need for DEM to conduct an extensive investigation of the premises. To issue the NOV, there just had to be a reasonable belief that a violation occurred. The information available to the agency at the time the NOV was issued, namely the reports of the employees and the lack of precision testing, served as a sufficient basis for the notice. Furthermore, the admission by the appellant, in his closure application, that the USTs last held gasoline in 1991 eliminated the need for DEM to conduct a further investigation prior to the administrative hearing.
Given the facts that the appellant did not seek permission to extend the temporary closure period prior to receiving the NOV and did not seek permission to remove the tanks until April 1995, this Court finds that the hearing officer was not clearly erroneous in concluding an abandonment under § 7.01 had occurred for the period commencing in May of 1993 and ending in May of 1995. The agency's finding that appellant abandoned his USTs in violation of § 15.02 of the 1992 UST Regulations is supported by the reliable, probative, and substantial evidence of record.
 THE ASSESSMENT OF THE ADMINISTRATIVE PENALTIES
Additionally, appellant challenges the imposition of an administrative penalty on four grounds. First, the appellant alleges that DEM failed to prove by a preponderance of the evidence that they took into account the factors listed in G.L. 1956 § 42-17.6-6, which governs the assessment of administrative penalties. Secondly, the appellant contends that DEM failed to state what a Type I violation was, how it was arrived at, when it was arrived at, or what factors were considered in determining that the appellant committed a Type I violation. The appellant further challenges the penalties on the basis that the penalties were determined by a committee rather than the Director, as required by G.L. 1956 § 42-17.6-2. Lastly, the appellant asserts that DEM should have been prohibited from imposing an additional, separate penalty for the "economic advantage" which the appellant allegedly gained due to his failure to perform precision testing prior to the enactment and adoption of the 1992 UST Regulations.
The DEM avers that it has the burden of proving the violation by a preponderance of the evidence and once that burden is satisfied, it becomes the appellant's burden to prove that the administrative penalty imposed was excessive. The DEM further contends that substantial evidence was offered in support of the proposed penalty calculation by DEM witness Susan Cabeceiras throughout her testimony. Lastly, DEM argues that the 1992 Penalty Regulations should apply to the instant matter since the NOV was issued after the effective date of the regulations and the minimum penalty for a Type I violation under the 1987 Penalty Regulations was $1500, or $150 more than that assessed using the 1992 Penalty Regulations with its separate economic advantage calculation.
Our Supreme Court has recognized that "in environmental regulation, wide latitude is given to state regulatory agencies on the assumption that such latitude is necessary for them to perform their functions of public service properly." Defenders ofAnimals v. Dept. of Env. Mgt., 553 A.2d 541, 543 (R.I. 1989) (citing 3A Sutherland Statutory Construction § 75.06). The assessment of administrative penalties for violations of DEM rules and regulations are governed by the Rules and Regulations for the Assessment of Administrative Penalties (Penalty Regulations). Section 4 (b) of the 1992 Penalty Regulations provides that the regulations are to be applied to all persons subject to enforcement action by the Department of Environmental Management. Additionally, § 14 of the 1992 Penalty Regulations provides that the regulations will not be construed to govern any enforcement action which is commenced prior to the formal adoption thereof, or administrative appeal taken therefrom. Given the fact that the NOV was issued by DEM on December 6, 1993, well after the effective date of the 1992 Penalty Regulations, and that the penalty assessed under the 1992 Penalty Regulations for the appellant's failure to precision test is less than the minimum penalty permitted under the 1987 Penalty Regulations even with the added economic advantage penalty included, this Court finds the hearing officer's concluding that the 1992 Penalty Regulations would govern the assessment of an administrative penalty in the instant matter is not in excess of statutory authority of the agency.
The assessment of penalties for DEM violations is governed by Sections 10 and 12 of the 1992 Penalty Guidelines. Pursuant to these guidelines, DEM must first classify the type of violation according to the nature of the legal requirement allegedly violated. Violation types consist of three categories. 1992 Penalty Regulations § 10 (a). Type I violations are those "violations of legal requirements identified by the Director as directly related to the protection of the public health welfare or environment." Type II violations are classified as "important by indirectly related to the protection of the public health, safety, welfare or environment." Type III violations are considered "important but incidental to the protection of public health, safety, welfare or the environment." Each type category contains a listing of several factors used to determining the classification. Id. at §§ 10 (a)(1)(A), (B), (C).
Once DEM has classified the category, DEM then assesses the deviation from the standard according to the degree to which the violation is out of compliance. Id. at § 10 (a)(2). Deviations from the standard are classified as either minor, moderate or major. Once the category and deviation are determined, DEM then consults the Water Pollution Control penalty matrix to ascertain the minimum and maximum penalty that could be assessed for the violation. Furthermore, in determining the amount of the penalty, DEM must consider G.L. 1956 § 42-17.6-6, which lists 12 factors the Director shall include in his/her consideration. Once the administrative penalty has been determined from the matrix, DEM then calculates the economic benefit of noncompliance, if any, which purports to offset the benefits of noncompliance.
"In an enforcement hearing the Director must prove the alleged violation by a preponderance of the evidence. Once a violation is established, the violator bears the burden of proving by a preponderance of the evidence that the Director failed to assess the penalty and/or the economic benefit portion of the penalty in accordance with these regulations." 1992 Penalty Regulations § 12 (c). The record evidences that the appellant has not satisfied his burden of demonstrating that the administrative penalty was not properly assessed.
The Decision and Order in this matter reveals that the hearing officer considered the testimony presented at the administrative hearing as well as the post-hearing memoranda of both parties in arriving at his final decision. At the administrative hearing, Ms. Cabeceiras testified that the failure to precision test was classified as a Type II violation based on the fact that precision testing is a preventative measure, which is the definition of Type [II], and . . . there is the potential for groundwater contamination and leaks, cleanup costs, et cetera." Transcript of October 24, 1995, pg. 9; see also 1992 Penalty Regulations § 10 (a)(1)(b) (a Type II violation can result from the failure to comply with any procedure required by any law administered by the Director). Ms. Cabeceiras further testified that the abandonment of the tanks was classified as a Type I violation given the fact that the definition of Type I specifically encompasses the failure to obtain approval and in the instant matter, the appellant failed to request an extension of the temporary closure of the tanks from the Director. Id. at 10. Ms. Cabeceiras additionally stated that, like the failure to precision test, when an abandonment occurs there is a potential of an undetected leak which could contaminate the soil and groundwater resulting in contamination of wells and involving cleanup costs. Id. In addressing the appellant's contention that the violations were technical violations, the hearing officer noted that "these violations cannot be treated as mere technical violations since the failure to comply with these regulations certainly poses a potential harm to the public health, safety, welfare and environment. Untested and/or abandoned USTs pose a serious threat because of the potential for undetected leaks which could result in significant contamination and resulting harm and exposure." Decision at 16-17.
The hearing officer's decision was supported by competent evidence of record that the deviations should be classified as minor for the abandonment and moderate for the lack of precision testing. Specifically, testimony was elicited that the situation was not such that the appellant had attempted to comply with the precision testing requirements but rather the appellant admitted that he did not precision test for the years listed in the NOV. Given the fact that there were successive years of similar violations, which demonstrated a history of noncompliance, and that the appellant did not take any action to mitigate the violations, the lack of precision testing was properly classified as moderate. Likewise, the appellant admitted at the hearing that the tanks last held gasoline in 1991 and that he failed to request either an extension or permanent closure at the expiration of the 180 temporary closure period. Transcript of October 24, 1995, pgs. 36, 37. As such, the abandonment also, to a lesser degree, demonstrated a history of noncompliance and that the appellant did not take any action to mitigate the violations and were properly classified as minor violations.
Furthermore, the record demonstrates that the factors set forth in G.L. 1956 § 42-17.6-6 were considered in the assessment of the administrative penalty. Ms. Cabeceiras testified that DEM had considered the actual and potential impact the violations would have on the public health, safety, welfare and environment. Transcript of October 24, 1995, pg. 9. The DEM concluded that both the lack of precision testing and abandonment of USTs created the potential for an undetected leak which could contaminate the soil and groundwater. Id. Furthermore, DEM considered whether the appellant had taken any steps to prevent noncompliance or to come into compliance with the violations alleged in the NOV and concluded that there were successive years of similar violations indicating a history of noncompliance. Id.
at 11. The DEM also considered the issue of making compliance less costly than noncompliance as well as the issue of deterring future noncompliance. Id. at 12. The $350 penalty per missed test represents the amount necessary to eliminate the economic advantage of noncompliance. While the record reveals that DEM did not consider the appellant's financial situation when issuing the NOV due to the fact that the information was unavailable to DEM at that time, it was the appellant's responsibility to provide financial records to the hearing officer if he wished to challenge the penalty due to his financial condition. Section 12 (c) of the 1992 Penalty Regulations states that "the violator bears the burden of proving by a preponderance of the evidence that the Director failed to assess the penalty and/or the economic benefit portion of the penalty in accordance with these regulations." Therefore, it was the appellant's burden to produce evidence of his financial condition at his hearing if he wished the Director to consider his financial condition in determining the administrative penalty. Although the appellant testified that he had expended nearly $40,000 to remove the tanks from the facility, he provided the hearing officer with no records to substantiate his claims. Id. at 35. Furthermore, the appellant failed to produce any records as to his financial condition or to specifically testify as to his assets, income, debts or liabilities. Decision at 16. Section 42-17.6-6 requires that the financial condition of the violator be considered to the extent practicable and in the instant matter the financial condition could not be considered in determining how much of a penalty to assess given the lack of evidence on the issue.
Pursuant to the Water Pollution Control penalty matrix as set forth in the Rules and Regulations, the minimum penalty of $1000 was assessed along with a $350 economic advantage penalty for each Type II Moderate Violation and a $2000 penalty per year for each tank which was abandoned. The total penalty was $24,750. The hearing officer concluded that the penalties for the violations were properly calculated in accordance with the 1992 Penalty Regulations.
From the evidence and memoranda before the hearing officer, this Court finds that the hearing officer's imposition of the minimum penalty of $1000 per each missed test, plus an additional $350 economic advantage penalty per missed test, for each Type II Moderate Violation was supported by the evidence of record and reflected the guidelines set forth in the General Laws. Furthermore, this Court finds that the hearing officer's imposition of $2000 per year for each abandoned UST was also supported by the evidence of record and is reflective of the guidelines set forth in the General Laws. Additionally, the record demonstrates that the penalties were determined by the Director pursuant to § 42-17.6-2. Although the penalty assessed in the NOV may have been determined by a committee, the assessment of the penalties came directly from the Director. "At the conclusion of the hearing, the hearing officer issues a written decision and order to the director" who may "adopt, modify, or reject the decision." Environmental Scientific Corp.v. Durfee, 621 A.2d 200, 203 (R.I. 1993). In the instant matter, the Director chose to adopt the decision and thereby imposed a penalty in the amount of $24,750.
After a review of the entire record, this Court finds that the hearing officer's decision that an abandonment occurred from May 1992 until May 1993 to be clearly erroneous in light of the reliable, probative, and substantial evidence on the record. As such, the hearing officer abused his discretion, and that part of his decision finding an abandonment in May 1992 must be reversed. Additionally, the hearing officer's determination that the appellant failed to precision test his USTs for the years 1986-1989 and that the appellant abandoned his tanks from May 1993 until May 1995 was supported by reliable, probative, and substantial evidence such that the appellant's rights have not been prejudiced. Furthermore, this Court finds that neither the agency's classification of the violations nor the calculations of the administrative penalties were in violation of statutory provisions or in excess of the statutory authority of the agency. Accordingly, the Final Decision and Order is affirmed in part and reversed in part, and the administrative penalty is reduced by $6,000 to $ 18,750.
Counsel shall prepare an appropriate order for entry.
[1] The appellant has owned the property since June 13, 1988. Prior to that date, the appellant originally owned the property as a joint tenant with Barbara Giarrusso. Ms. Giarrusso transferred her interest to the appellant via quick claim deed on June 13, 1988.